IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA


SARA PICKETT                  :    No. 2021-FC-001007-03
                              :
     VS                       :
                              :
KRISTOFFER HEXTER &           :
BRUCE HEXTER                  :


York, Pa., Thursday, June 2, 2022

Before the Honorable N. CHRISTOPHER MENGES, Judge


APPEARANCES:

        JOSHUA A. SCOTT HARSHBERGER, Esquire
        For the Defendant & Intervenor


TRANSCRIPT OF PROCEEDINGS


Reported by:

Emily Riccardi
Official Court Reporter

<u>INDEX TO WITNESSES</u>

<u>FOR THE PLAINTIFF:</u>

<u>SARA PICKETT</u>
DIRECT EXAMINATION BY THE COURT......................3
CROSS EXAMINATION BY ATTORNEY HARSHBERGER...........17

<u>FOR THE DEFENDANT:</u>

<u>BRUCE HEXTER</u>
DIRECT EXAMINATION BY ATTORNEY HARSHBERGER..........30
CROSS EXAMINATION BY MS. PICKETT....................40

<u>KRISTOFFER HEXTER</u>
DIRECT EXAMINATION BY ATTORNEY HARSHBERGER..........42

PROCEEDINGS HELD ON THURSDAY, JUNE 2, 2022

\*   \*   \*

14:01:51  3        THE COURT:  We're here to finish a

14:01:55  4    custody trial.  I believe, Ms. Pickett, you're

14:01:58  5    representing yourself?

14:02:00  6        MS. PICKETT:  That's correct.

14:02:00  7        THE COURT:  Then I think it's your time

14:02:02  8    to put your case on.  Are you ready to do that?

14:02:04  9        MS. PICKETT:  Yes, Your Honor.

14:02:05  10       THE COURT:  Who do you want to call as

14:02:06  11   your first witness?

14:02:07  12       MS. PICKETT:  I don't have any

14:02:08  13   witnesses.  It's just myself.

14:02:10  14       THE COURT:  All right.  Why don't you

14:02:11  15   stand and raise your right hand and the clerk can swear

14:02:14  16   you in?

17                 \*   \*   \*

18                 SARA PICKETT,

19              called as a witness,

20        having been duly sworn according to law,

21              testified as follows:

22                 \*   \*   \*

23              DIRECT EXAMINATION

14:02:29  24       THE CLERK:  Please state and spell your

14:02:31  25   first and last name.

| | | |
|---|---|---|
| 14:02:31 | 1 | THE WITNESS:  Sara Pickett, S-A-R-A, |
| 14:02:34 | 2 | P-I-C-K-E-T-T. |
| 14:02:37 | 3 | THE COURT:  And you are the mother of |
| 14:02:39 | 4 | these two children? |
| 14:02:40 | 5 | THE WITNESS:  That's correct. |
| 14:02:41 | 6 | THE COURT:  What would you like to tell |
| 14:02:42 | 7 | the Court? |
| 14:02:43 | 8 | THE WITNESS:  Okay.  I have some notes |
| 14:02:46 | 9 | if that's okay. |
| 14:02:46 | 10 | THE COURT:  Just don't read from them, |
| 14:02:48 | 11 | and bear in mind, any notes you refer to, Attorney |
| 14:02:52 | 12 | Harshberger has the right to look at. |
| 14:02:54 | 13 | THE WITNESS:  Okay. |
| 14:02:55 | 14 | THE COURT:  Go ahead. |
| 14:02:59 | 15 | THE WITNESS:  So the most important |
| 14:03:01 | 16 | point that I would like to clarify about this case is |
| 14:03:02 | 17 | that it was never a disagreement of whether or not -- |
| 14:03:08 | 18 | THE COURT:  Yeah.  You're going to have |
| 14:03:10 | 19 | to slow down.  Attorneys practice for years how to slow |
| 14:03:14 | 20 | down. |
| 14:03:14 | 21 | THE WITNESS:  I apologize.  Being in |
| 14:03:16 | 22 | court makes me a little anxious. |
| 14:03:18 | 23 | THE COURT:  That's all right.  Go ahead. |
| 14:03:20 | 24 | THE WITNESS:  So the most important |
| 14:03:23 | 25 | point that I would like to clarify is that this was |

| | |
|---|---|
| 14:03:26 | 1 |
| 14:03:28 | 2 |
| 14:03:31 | 3 |
| 14:03:34 | 4 |
| 14:03:38 | 5 |
| 14:03:42 | 6 |
| 14:03:45 | 7 |
| 14:03:48 | 8 |
| 14:03:50 | 9 |
| 14:03:54 | 10 |
| 14:03:58 | 11 |
| 14:04:01 | 12 |
| 14:04:06 | 13 |
| 14:04:08 | 14 |
| 14:04:16 | 15 |
| 14:04:19 | 16 |
| 14:04:23 | 17 |
| 14:04:26 | 18 |
| 14:04:30 | 19 |
| 14:04:32 | 20 |
| 14:04:36 | 21 |
| 14:04:38 | 22 |
| 14:04:41 | 23 |
| 14:04:46 | 24 |
| 14:04:48 | 25 |

never a disagreement of whether or not grandfather should be allowed to see the children or not.  It was just a disagreement of having the written Court-Order, because as a parent, I have the to make these decisions in the best interest of my children regarding what the situation looks like and he apparently expected some control of that situation.  And that's one of the most concerning things to me in this case because he was given an open invitation upon filing this to reach out to me and make these arrangements to, you know, visit with the kids, make phone calls, and such.  And I feel that if he was genuine in just wanting this normal grandparent-relationship, he would have happily taken me up on that invitation instead of -- sorry -- to make these arrangements without unnecessary court interference, without spending unnecessary time, money, and stress to fight this unnecessary battle.  Instead for eight months, both father and grandfather made no contact with the children all to turn around and claim to the Court that I prevented contact so that the Court would have to interfere.

A claim that appears often throughout our case most recently the October 2020 contempt Order where it was ordered that Lebanon County Children & Youth provide father with my with -- with what is

14:04:50  1   currently my most recent contact information.

14:04:55  2   Unfortunately, this is a high conflict case and

14:04:59  3   grandfather is not separate from that, made it obvious

14:05:01  4   from the fact that they share an attorney and goal for

14:05:03  5   the outcome of this case.

14:05:05  6           Grandfather has never previously had

14:05:08  7   this level of relationship with the children which

14:05:10  8   means that either father has never previously allowed

14:05:12  9   it, or grandfather has never previously showed an

14:05:15  10  interest of that sort.  However, upon father's

14:05:17  11  incarceration, they are completely lined up what that

14:05:21  12  relationship should look like.

14:05:23  13          Grandfather is correct that he's been

14:05:24  14  blocked from my social media due to his own behavior of

14:05:27  15  sending me rude messages.  Behavior that has resurfaced

14:05:31  16  since the entering of the temporary orders where he has

14:05:34  17  demanded control of what the situation looks like and

14:05:37  18  if I don't comply with his random calls or I attempt to

14:05:42  19  set boundaries, the interaction ends with some

14:05:46  20  variation of I'm telling on you.

14:05:49  21          THE COURT:  So let me see if I can help

14:05:51  22  you here a little bit.

14:05:53  23          THE WITNESS:  Sure.

14:05:54  24          THE COURT:  I think what I'm hearing,

14:05:56  25  but tell me if I'm wrong, is the temporary Order went

6

14:05:58  1   into effect a couple months ago, grandfather has had

14:06:01  2   some visits -- and you haven't told me how those visits

14:06:04  3   have gone -- but you believe that he has somehow

14:06:09  4   interfered with you -- somehow the communication's not

14:06:15  5   been good.

14:06:16  6               THE WITNESS:  No, it really never has

14:06:18  7   been.

14:06:18  8               THE COURT:  Okay.

14:06:18  9               THE WITNESS:  Like I was saying, it's a

14:06:20  10  high conflict situation that involves grandfather as

14:06:25  11  well.  That's not new.

14:06:26  12              THE COURT:  Well, let's start with how

14:06:28  13  these children do on their visits.  How do the visits

14:06:35  14  go?

14:06:36  15              THE WITNESS:  Beforehand there's crying

14:06:38  16  and telling me -- I don't think I'm allowed to say

14:06:41  17  that.  There's crying and not wanting to go with.

14:06:46  18              THE COURT:  How are they when they get

14:06:48  19  back?

14:06:48  20              THE WITNESS:  I think it's a little bit

14:06:50  21  uncomfortable because of the animosity between

14:06:55  22  grandfather and I.  There's not much that's said at

14:06:57  23  those visits.  At the first visit, grandfather was

14:07:01  24  handing them a bunch of toys that he had bought them

14:07:03  25  and told them in front of me that he doesn't believe

14:07:06    1    that mother will allow them to keep the toys because

14:07:10    2    she doesn't like me.  And I since attempted to simply

14:07:15    3    have no communication at these exchanges but he kind of

14:07:18    4    insists on it.

14:07:20    5                THE COURT:  What kind of communication

14:07:22    6    are you and he having at the exchanges?

14:07:25    7                THE WITNESS:  I try to say nothing or

14:07:27    8    keep it, you know, as minimal as possible and walk away

14:07:30    9    as quickly as I can.

14:07:34    10                THE COURT:  And what is he doing?

14:07:35    11                THE WITNESS:  Like I said, at the first

14:07:37    12    one he had made those comments to the children in front

14:07:39    13    of me and I had attempted to walk away and he kept kind

14:07:45    14    of getting in my space to tell me when he was going to

14:07:48    15    make his next phone call and insisting that I was going

14:07:52    16    to listen to him at that point, which I did not feel

14:07:55    17    comfortable with.

14:08:08    18                THE COURT:  Well, he is allowed to have

14:08:10    19    phone or video three times a month, right?

14:08:14    20                THE WITNESS:  That's correct.  It says

14:08:15    21    as the parties agree, and we've arranged one phone

14:08:19    22    call, but have not been able to agree since.  It's been

14:08:21    23    kind of, you know, he makes a demand, this is when I'm

14:08:23    24    going to call.  I say something along the lines of, you

14:08:25    25    know, like this day or time might work better for me

| | |
|---|---|
| 14:08:28 | 1 |

then the response is, well, I'm working at that time.

Even though he told us he was retired and not working

in the last hearing.

THE COURT:  Any particular reason these

communications couldn't be by text or email or

something a little less personal.

THE WITNESS:  We do typically

communicate via text.

THE COURT:  How do those go?

THE WITNESS:  Not so well.

THE COURT:  Why is that?

THE WITNESS:  It's basically the same

thing.  He'll tell me when he's going to call or, you

know, demand what the situation look like and if I'm

opposed to that at all or it simply doesn't work with

our schedules, you know, then he's telling me I'm going

to tell the Judge.  I'm reporting you to my lawyer.

I'm going to file something against you.  Like I said,

some kind of variation of I'm telling on you.  I'm

doing my best to work this out.  I'm not trying to

prevent communication, but at this point I'm working 45

hours a week as a sole provider for my children.  We

have socialize, activities, and appointments outside of

that so we have things that we're working around that

are priorities.

14:09:30  1          THE COURT:  All right.  What else would

14:09:31  2  you like to tell me?

14:09:32  3          THE WITNESS:  Okay.  Well, since I

14:09:36  4  mentioned those comments that he made at the last

14:09:39  5  exchange, I don't feel it's okay to make these comments

14:09:41  6  that may agree at ill feelings, like, from the children

14:09:45  7  towards me or anything of that nature.  And the

14:09:47  8  situation in general is just creating a lot of anxiety

14:09:50  9  and I don't feel like this situation is what our lives

14:09:54  10  should look like.

14:09:56  11          THE COURT:  So if you were me, if you

14:09:58  12  were the judge, how would you make the communications

14:10:04  13  between the children and their Pop Pop happen?

14:10:07  14          THE WITNESS:  I'm honestly not certain

14:10:12  15  at this point.  I feel like my initial request was to

14:10:16  16  make it kind of scheduled so that, you know, father has

14:10:19  17  I'm going to call at this time and this day so we're

14:10:22  18  not coming into court because she's not getting my

14:10:24  19  phone calls when it's totally random and I'm not always

14:10:28  20  available.  And I feel like that might be the best

14:10:31  21  route to go for grandfather as well because then he

14:10:33  22  doesn't have the opportunity to try to, you know, bully

14:10:36  23  me into doing what he wants.

14:10:39  24          THE COURT:  Okay.  Any other

14:10:41  25  suggestions?

14:10:42  1        THE WITNESS:  I mean, honestly my stance
14:10:46  2  as a whole is we should have been able to make these
14:10:50  3  arrangements between ourselves.
14:10:52  4        THE COURT:  But you obviously can't.
14:10:53  5  You've just testified to that.  You can't communicate
14:10:57  6  well.
14:10:57  7        THE WITNESS:  Right.  And I've made
14:11:00  8  attempts but that communication takes two people, Your
14:11:03  9  Honor.  And it's been a significant issue in our case
14:11:06  10  involving father as well.  We've always have had to
14:11:08  11  have an attorney mediating communication, things of
14:11:10  12  that nature because it always ends up in threats,
14:11:14  13  intimidation, bullying, and things like that.  And
14:11:17  14  unfortunately, that's what this situation has devolved
14:11:21  15  into as well.  And the only thing I'm expecting is that
14:11:26  16  grandfather learns to communicate with me respectfully
14:11:30  17  in order to make these arrangements.
14:11:35  18        THE COURT:  Any chance that you are
14:11:37  19  taking the intimidation, bullying, et cetera, that you
14:11:43  20  believe father has done -- but now he's in prison --
14:11:46  21  any chance you're taking that and sort of projecting
14:11:50  22  that onto father's father when maybe it isn't quite as
14:11:54  23  bad as you think it is?
14:11:56  24        THE WITNESS:  No, Your Honor.
14:11:56  25  Unfortunately, like I said before, this isn't new.

14:12:00  1    when father was incarcerated the first time -- he did

14:12:03  2    four months for a probation violation for these

14:12:06  3    charges -- during that time, grandfather and I were

14:12:09  4    able to arrange phone calls and I believe there is one

14:12:12  5    visit during that time and it was okay.  And then at

14:12:15  6    the end -- like, as father was getting out of jail, at

14:12:19  7    that time he started texting me messages about how I'm

14:12:23  8    a lazy mother and just rude things that are completely

14:12:25  9    unnecessary causing drama that just doesn't need to be

14:12:28  10   there.  That's why he was ultimately blocked at that

14:12:35  11   time from my Facebook.

14:12:37  12             THE COURT:  All right.  Now, you said as

14:12:39  13   father was getting out of jail he started texting you

14:12:44  14   being a lazy mother and so forth; is that correct?  Is

14:12:48  15   that he the father or the grandfather?

14:12:49  16             THE WITNESS:  That was grandfather, Your

14:12:51  17   Honor.

14:12:51  18             THE COURT:  Okay.  So in prior

14:12:55  19   communications, the first time father was incarcerated,

14:12:58  20   grandfather would call you names like lazy?

14:13:03  21             THE WITNESS:  Yeah.  In the beginning we

14:13:05  22   were able to arrange him seeing and talking to the kids

14:13:08  23   and it wasn't an issue but I knew there were personal

14:13:12  24   feelings there but it didn't create any conflict at

14:13:16  25   that point.  It was I would say early to mid September

14:13:19  1   right around the time of father's release when the tone

14:13:21  2   of everything just kind of changed.

14:13:25  3              THE COURT:  What, if any, steps have you

14:13:28  4   taken to try to find a therapist for a [A.P.]?

14:13:35  5              THE WITNESS:  This was actually in play

14:13:37  6   prior to the last hearing.  We have a referral from

14:13:41  7   Hayshire Elementary where the children attend school.

14:13:44  8   It was for [R.H.] but it's for family therapy for the

14:13:47  9   three of us so we can all get the evaluations that we

14:13:50  10  need and do family therapy together as well as getting

14:13:52  11  the referrals for individual services so we can create

14:13:55  12  a long term plan.

14:13:57  13             THE COURT:  And who's the referral to?

14:13:59  14  What agency or what practice?

14:14:01  15             THE WITNESS:  Laurel Life I believe it's

14:14:03  16  called.

14:14:04  17             THE COURT:  Okay.  So has an intake

14:14:07  18  taken place?

14:14:08  19             THE WITNESS:  Not yet.  I'm waiting for

14:14:09  20  them.  I will give them a call after we're done here to

14:14:23  21  check on that.

14:14:23  22             THE COURT:  What else would you like to

14:14:24  23  tell me?

14:14:25  24             THE WITNESS:  Okay.  I just feel like

14:14:27  25  gaining some resemblance to normal life after these

13

14:14:30  1    years of continuous fears of control and abuse that

14:14:34  2    what would be therapeutic for my children and I and

14:14:38  3    that includes learning how to navigate healthy

14:14:41  4    consensual relationships on the kids terms, a skill

14:14:45  5    that's important as they get older.  And I think my

14:14:48  6    stance has been pretty reasonable in the expectation as

14:14:51  7    the normal grandparent he would be the one putting

14:14:54  8    forth the effort to fit into the kids lives on their

14:14:58  9    terms as they are comfortable with.

14:15:00  10            I'm always willing to put aside my

14:15:01  11    personal feelings for my children and their best

14:15:02  12    interest.  That's never been a problem for me, but it

14:15:05  13    also requires him, like I said, to treat me with a

14:15:07  14    level of respect in order to make these arrangements.

14:15:10  15    Like I said, he's had open communication to reach out

14:15:13  16    and attempt to make the same kind of situation that we

14:15:14  17    had in the beginning of father's first incarceration.

14:15:18  18    and I just don't feel like if he has such animosity

14:15:22  19    towards me that it could be a healthy situation to

14:15:25  20    force us into by Court Order.

14:15:28  21            THE COURT:  So I think what I'm hearing,

14:15:30  22    but please tell me if I'm wrong, I think what I'm

14:15:34  23    hearing is the temporary Order I issued on April 7,

14:15:40  24    2022, you would like to see improved so that the --

14:15:50  25    what is it?  Three -- every week that the phone

14

| | |
|---|---|
| 14:15:55 | 1 |
| 14:16:07 | 2 |
| 14:16:10 | 3 |
| 14:16:13 | 4 |
| 14:16:17 | 5 |
| 14:16:18 | 6 |
| 14:16:20 | 7 |
| 14:16:23 | 8 |
| 14:16:27 | 9 |
| 14:16:30 | 10 |
| 14:16:30 | 11 |
| 14:16:32 | 12 |
| 14:16:38 | 13 |
| 14:16:40 | 14 |
| 14:16:52 | 15 |
| 14:16:55 | 16 |
| 14:16:58 | 17 |
| 14:17:02 | 18 |
| 14:17:04 | 19 |
| 14:17:08 | 20 |
| 14:17:12 | 21 |
| 14:17:15 | 22 |
| 14:17:17 | 23 |
| 14:17:21 | 24 |
| 14:17:25 | 25 |

contact -- yeah, three times a month that the phone contact or video contact between Pop Pop and the children three times a month would be set dates and times and that you would like him to be more respectful in his communications.

THE WITNESS: I mean, I suppose if that's the only solution that we have because I feel like it should be entirely on him to be respectful and be able to reach out and make these arrangements on his own.

THE COURT: Okay. Anything else you want to tell me?

THE WITNESS: Sorry. I'm trying to see the points that are relevant at this point. I guess I feel like in this situation that the grandparents rights are being used as kind of a means to keep us under control for the man who has victimized us for years. And I just don't feel like it's appropriate to do that just because he's incarcerated and has family that's willing to be kind of tagged into this situation. My kids and I have been speaking openly about our experiences, you know, the violence and the fear since the beginning -- since 2018 when I filed this custody case to begin with and we just desperately looked for help. We said, you know, we're mocked.

14:17:27  1    We're threatened. We're ignored. While his behavior

14:17:30  2    is continuously enabled by the court system and it's

14:17:34  3    horrifying pattern for utter disregard for our rights

14:17:38  4    and our safety, and that stems just from the existence

14:17:42  5    of this custody case and the same control that's being

14:17:44  6    used over us now.

14:17:45  7                THE COURT: Okay. Anything else?

14:17:47  8                THE WITNESS: I don't think that forcing

14:17:59  9    these relationships on the children will suddenly make

14:18:03  10   them healthy or make the children see them as safe

14:18:08  11   people like you mentioned in the last hearing who they

14:18:10  12   would want to have at their weddings and amazing events

14:18:13  13   they have in their lives. Unfortunately, that's just

14:18:15  14   not how it works out all of the time. And my kids have

14:18:19  15   already expressed their feelings on the matter. I

14:18:21  16   understand that you would like to see that become the

14:18:23  17   reality in every one of these cases, but unfortunately,

14:18:26  18   it's just not safe in every situation. And this isn't,

14:18:30  19   you know, just some personal minor issues between

14:18:33  20   grandfather and I that need to be patched up to make

14:18:36  21   this work out. If this is granted, I will be forced to

14:18:39  22   continue fighting for safety of my children where this

14:18:42  23   is the time where we should be allowed to process our

14:18:44  24   experiences, to start our family therapy, and like,

14:18:46  25   without unnecessary interference, and create a long

14:18:50    1    term plan to heal and move on.

14:18:52    2                    THE COURT:  Okay.  All right.  Attorney

14:18:53    3    Harshberger, questions?

14:18:54    4                    ATTORNEY HARSHBERGER:  Thank you.

14:18:55    5                    CROSS EXAMINATION

14:18:55    6    BY ATTORNEY HARSHBERGER:

14:18:56    7        Q.    You mentioned -- Ms. Pickett, you mentioned

14:18:59    8    in 2018 you filed for custody, where did you file for

14:19:02    9    custody at?

14:19:03   10        A.    Lebanon County.

14:19:05   11        Q.    And in that county, Kris Hexter is named the

14:19:14   12    father of both children; is that correct?

14:19:16   13        A.    There's some question with [A.P.].

14:19:19   14        Q.    Through that custody Order, he is named the

14:19:22   15    father of both children.  Correct?

14:19:23   16        A.    Correct.

14:19:24   17        Q.    Okay.  Now, since then, there's been multiple

14:19:27   18    and many different court actions between you and Kris

14:19:33   19    in Lebanon County, correct?

14:19:35   20        A.    That's correct.

14:19:36   21        Q.    When did you first get the referral for

14:19:42   22    Laurel Life?

14:19:43   23        A.    I don't have a date.  This would have been --

14:19:47   24    April 7th would have been our last court date, maybe

14:19:50   25    two weeks before then.  It's actually [R.H.]'s behavior

14:19:55    1    that led to the referral.

14:19:57    2      Q.   And so the school referred [R.H.] for family

14:20:05    3    based counseling?

14:20:05    4      A.   The family based part of it was at my

14:20:08    5    request.   He was referred for full psychological and

14:20:12    6    psychiatric evaluations.

14:20:13    7      Q.   But you haven't taken any steps since then to

14:20:20    8    get in, correct?

14:20:22    9      A.   No.   I've been in contact with the school to

14:20:24   10    push through the referral and [R.H.] has been

14:20:26   11    talking -- well, until school ended, [R.H.] was talking

14:20:30   12    to the school counselor.

14:20:31   13      Q.   But [A.P.] has not been in any kind of

14:20:34   14    counseling, correct?

14:20:35   15      A.   Correct.

14:20:38   16      Q.   And you have not sought a therapist

14:20:41   17    independently for a [A.P.], correct?

14:20:45   18      A.   That will be done through family therapy.

14:20:47   19           THE COURT:   Well, answer the question.

14:20:48   20    Have you done that directly?

14:20:53   21           THE WITNESS:   Correct.

14:20:54   22    BY ATTORNEY HARSHBERGER:

14:20:54   23      Q.   Correct as in no you have not gotten [A.P.] a

14:20:58   24    therapist?

14:20:59   25      A.   Nope.

14:20:59  1      Q.    And when did the school tell you to call
14:21:06  2   Laurel Life to set up intake?  Two weeks before the
14:21:10  3   first custody hearing?
14:21:12  4      A.    No.  They told me that -- actually that would
14:21:15  5   be hearsay.  I was -- they were entering the referral
14:21:19  6   and I was to wait for contact from them.  Since it's
14:21:23  7   been so long, like I said, I'll make contact with them
14:21:26  8   after this hearing to check on the status with that.  I
14:21:28  9   understand there there's some level of waitlist
14:21:30  10  involved.
14:21:30  11     Q.    So you just testified that you have this
14:21:33  12  overriding concern for the mental stability of your
14:21:39  13  children and two weeks prior to April 7th you were
14:21:42  14  given a referral and you waited until after today's
14:21:45  15  hearing to call for the follow up of the intake for
14:21:51  16  Laurel Life; is that correct?
14:21:52  17     A.    Correct.  I'm expecting a call from Laurel
14:21:56  18  Life to set that up.
14:21:57  19     Q.    And you testified that when Kris was
14:22:01  20  incarcerated for a probation violation, that you --
14:22:06  21  your communication with Bruce was good at first, right?
14:22:10  22     A.    Correct.
14:22:10  23     Q.    And then you blocked him on social media,
14:22:14  24  correct?
14:22:16  25     A.    Correct.

| | | |
|---|---|---|
| 14:22:16 | 1 | Q.   And you have not unblocked him since then? |
| 14:22:18 | 2 | A.   Correct.  I'm not obligated to. |
| 14:22:21 | 3 | Q.   Right.  And when did Kris go for his |
| 14:22:26 | 4 | probation violation? |
| 14:22:27 | 5 | A.   If I remember correctly that would have been |
| 14:22:29 | 6 | May of 2020 through September of 2020. |
| 14:22:32 | 7 | Q.   Okay.  And so, since Kris was incarcerated |
| 14:22:41 | 8 | this most recent time, you have not reached out to |
| 14:22:44 | 9 | Bruce regarding contact with the grandchildren, |
| 14:22:49 | 10 | correct? |
| 14:22:49 | 11 | A.   Correct.  I feel like that's his |
| 14:22:52 | 12 | responsibility. |
| 14:22:53 | 13 | Q.   The visits that occurred on April 9th and May |
| 14:23:05 | 14 | 14th, grandfather came to pick up the children, |
| 14:23:12 | 15 | correct? |
| 14:23:12 | 16 | A.   Correct. |
| 14:23:13 | 17 | Q.   And he dropped the children off, correct? |
| 14:23:16 | 18 | A.   Correct. |
| 14:23:16 | 19 | Q.   And you viewed the car?  It was safe and |
| 14:23:21 | 20 | appropriate, correct? |
| 14:23:21 | 21 | A.   I'm sorry? |
| 14:23:22 | 22 | Q.   You viewed the car?  It was safe and |
| 14:23:24 | 23 | appropriate? |
| 14:23:24 | 24 | A.   I didn't see the car seats, but as far as the |
| 14:23:27 | 25 | car goes, correct. |

14:23:28  1        Q.    And after the first visit, grandfather gave

14:23:31  2    the children some Christmas and birthday gifts,

14:23:35  3    correct?

14:23:36  4        A.    I'm not sure what they were from but he gave

14:23:38  5    them some toys, yes.

14:23:40  6        Q.    And the second visit, he bought the children

14:23:44  7    I think [R.H.] new shoes and [A.P.] a toy because she

14:23:54  8    didn't need shoes; is that correct?

14:23:56  9        A.    Correct.

14:23:56  10       Q.    Do you know -- did the children tell you what

14:23:59  11   they did during the time with Pop Pop?

14:24:02  12       A.    No.  They don't talk about it with me.  They

14:24:05  13   don't have any interest.

14:24:07  14       Q.    You mentioned you want to have this

14:24:09  15   standardized or concrete call time, did your counsel

14:24:15  16   communicate with me regarding setting up a time?

14:24:17  17       A.    Yes.

14:24:18  18       Q.    Okay.  Now, were you made aware that there

14:24:23  19   was an agreement between counsel that Wednesday at 5:00

14:24:27  20   would be that time?

14:24:28  21       A.    That is incorrect.  My attorney did not

14:24:32  22   have -- did not have my permission to make an agreement

14:24:35  23   on my behalf.

14:24:36  24       Q.    Okay.  So grandfather was trying to call

14:24:39  25   Wednesdays at 5:00 and through communication with you

| 14:24:43 | 1 | via text, you said Mondays at 4:00; is that correct? |

via text, you said Mondays at 4:00; is that correct?

A.    Correct, at that time.

Q.    Right.  And so even on Mondays you failed to answer the phone when Bruce called; is that correct?

A.    Correct.  But my schedule has changed with work.

Q.    Did you notify grandfather that your schedule changed and the time would have to change?

A.    I have made a couple of attempts to let him know that the times that he was asking for did not work for me because of my work schedule and he simply demanded, like -- let me try to remember what he said. He said these are times that are within the times that I was given to call so this is when I'm calling.

Q.    You told him Monday at 4:00, right?

A.    Correct, for that week.

Q.    And you still did not answer the phone, correct?

A.    That's not correct.  The first Monday that we had made arrangements for 4:00 p.m., we did successfully have that communication with the children. We have not been able to make an agreement as to when those phone calls will happen since then.

Q.    Let me ask you this now, what is your current work schedule?

22

14:25:57   1          A.   It varies which is why this is difficult and

14:26:00   2   I need him to be flexible.   I work as a contractor.

14:26:04   3   I'm a business manner.   My schedule can change

14:26:07   4   depending on what my contracts are.

14:26:10   5          Q.   Where do you work?

14:26:11   6               THE COURT:   But, ma'am, you testified in

14:26:13   7   response to my questions, you wanted a set date and

14:26:16   8   time.

14:26:17   9               THE WITNESS:   Right.   And if we can nail

14:26:18   10  that down and not have to deal with this outside of

14:26:21   11  court, I will make that work, but I'm not going to do

14:26:24   12  the back and forth and being bullied into, well, no,

14:26:27   13  this is when I want the call.

14:26:28   14  BY ATTORNEY HARSHBERGER:

14:26:29   15         Q.   But we had this worked out where it was

14:26:30   16  Wednesday at 5:00 p.m., at one point in time, correct?

14:26:34   17  Although that was counsel's representation that you

14:26:37   18  agreed to that, but that was one day and time that was

14:26:40   19  agreed upon.   Do you agree with that?

14:26:43   20         A.   No.   That was my problem from the beginning,

14:26:47   21  which is why --

14:26:49   22         Q.   And then you agreed --

14:26:50   23         A.   Sorry.   Should I finish?

14:26:53   24         Q.   Go ahead.

14:26:55   25               THE COURT:   Go ahead and finish your

23

14:26:57  1    answer.

14:26:57  2              THE WITNESS:  Now I lost my train of

14:27:00  3    thought.  We had the conversation going between

14:27:02  4    attorneys and because that can kind of take time

14:27:04  5    because they are both busy with things outside of our

14:27:07  6    case.  I reached out to grandfather to let him know

14:27:09  7    that this time is not going to work for me, Wednesdays

14:27:12  8    at 5:00, because now I'm working at this point and I'm

14:27:15  9    going to need him to be flexible and change that

14:27:17  10   around.  We might have to arrange things week by week

14:27:20  11   but he needs to work with me.  And that was when he

14:27:23  12   said, no, the time that you're proposing is when I'm at

14:27:26  13   work so I can't do that.

14:27:28  14   BY ATTORNEY HARSHBERGER:

14:27:31  15        Q.   So what is your work schedule?

14:27:35  16        A.   It's typically about 9:00 to 5:00.  If I have

14:27:40  17   -- one of my main clients right now is an online

14:27:43  18   coaching company who often has live events and

14:27:46  19   sometimes those can go from 9:00 a.m. to 11:00 p.m.

14:27:49  20   because they are working on specific time so it just

14:27:54  21   kind of varies.

14:27:55  22        Q.   So do you ever work past 5:00?

14:27:58  23        A.   Yes.

14:27:59  24        Q.   How often do you work past 5:00?

14:28:04  25        A.   I would say probably two to three days a

14:28:09    1    week.

14:28:09    2        Q.    What's the latest you work until?

14:28:12    3        A.    Like I said, event dates can go until

14:28:14    4    11:00 p.m. my time and kids are well in bed by then.

14:28:17    5        Q.    Who watches the children at this time -- you

14:28:19    6    live alone, correct?  Single mother?

14:28:21    7        A.    Correct.  And I work from home which means

14:28:24    8    that the children can stay with me while I'm at work.

14:28:28    9                    THE COURT:  So, ma'am, let's cut to the

14:28:29    10    chase, if you want me to order three times a month,

14:28:32    11    date and time, what do you want them to be?

14:28:34    12                    THE WITNESS:  Honestly, I think that's

14:28:36    13    excessive given the prior relationship.  However --

14:28:39    14                    THE COURT:  That's not the question.

14:28:40    15    What do you want them to be?

14:28:41    16                    THE WITNESS:  However, I think that if

14:28:44    17    we can do -- would it be possible to nail it down so

14:28:47    18    that father and grandfather would have their calls back

14:28:50    19    to back, so we only have to do this once?  I'm just

14:28:53    20    asking to make this easier for everybody.  Like, if we

14:28:55    21    did grandfather at 5:30 and father at 6:00 or something

14:28:59    22    of that nature.

14:29:00    23                    THE COURT:  My question was a simple

14:29:02    24    one.  When do you want these three times with

14:29:04    25    grandfather to be?  I'm not mixing grandfather and

25

14:29:07  1    father.  They are separate in my mind.  I know they are

14:29:10  2    not separate in your mind, but they are separate in my

14:29:13  3    mind.  When do you want these three calls from Pop Pop

14:29:17  4    to be per month, date and type?  What's your

14:29:19  5    preference?

14:29:21  6                    THE WITNESS:  I guess Mondays at 6:00.

14:29:31  7                    THE COURT:  Okay.  All right.  Go ahead,

14:29:33  8    Attorney Harshberger.

14:29:36  9                    THE WITNESS:  That doesn't conflict with

14:29:39  10   the work schedule that he doesn't have.

14:29:51  11                   THE COURT:  Do you have other questions,

14:29:53  12   Attorney Harshberger?

14:29:54  13                   ATTORNEY HARSHBERGER:  Just briefly.

14:29:55  14                   THE COURT:  I know I interrupted your

14:29:57  15   train of thought.

14:29:58  16                   ATTORNEY HARSHBERGER:  No.  He asked

14:29:59  17   Monday at 6:00 and I wanted to make sure I jotted that

14:30:02  18   down too.

14:30:03  19                   THE COURT:  Okay.

14:30:11  20   BY ATTORNEY HARSHBERGER:

14:30:11  21        Q.   Has there been any school -- have the

14:30:13  22   children received any report cards this year?

14:30:16  23        A.   No.  I have not received anything.

14:30:18  24        Q.   Have the children received any school

14:30:21  25   pictures at all this year?

14:30:23    1        A.    They did but I did not purchase any.

14:30:25    2        Q.    Would you be opposed to the upcoming school

14:30:36    3    year let grandfather know of school pictures so he

14:30:41    4    could purchase said pictures?

14:30:44    5        A.    I'm going to say no because I'm pretty sure I

14:30:48    6    don't have a choice.

14:30:50    7        Q.    So have you gotten any -- you haven't got

14:30:55    8    grades yet for the children?

14:30:58    9        A.    That's correct.

14:30:59    10       Q.    Now, when are the children done in school?

14:31:02    11       A.    They were finished on May 26th I want to say

14:31:06    12    was their last day.

14:31:08    13       Q.    And so you have not received a final report

14:31:10    14    card for the children?

14:31:11    15       A.    No, I have not received any report cards

14:31:14    16    during the school year at all.  They said that they do

14:31:16    17    do grading of that nature but they haven't sent

14:31:21    18    anything home for me.

14:31:21    19       Q.    Is there anything on the online system for

14:31:24    20    that school if they do have an online system?

14:31:27    21       A.    They do.  I'm honestly not sure if they would

14:31:30    22    have that up.  I would assume that's where it would be

14:31:33    23    found if they have it posted for children that young.

14:31:36    24       Q.    So you have no idea how well you're children

14:31:40    25    are doing in school?

14:31:44   1        A.    I do.  We have the student-teacher

14:31:46   2   conferences where the teachers keep me up-to-date how

14:31:51   3   they are doing in school.

14:31:53   4        Q.    How often do you have parent-teacher

14:31:56   5   conferences?

14:31:56   6        A.    They have one per semester.  So that would be

14:32:00   7   the same occurrence that they would be receiving report

14:32:03   8   cards if they were older.

14:32:07   9        Q.    The children were brought back to you at the

14:32:18   10   appropriate time and appropriately dressed and well

14:32:22   11   cared for, right?

14:32:23   12        A.    Correct.  They were brought home

14:32:26   13   approximately an hour early both times.

14:32:34   14        Q.    Would you be agreeable to grandfather would

14:32:41   15   have a weekend with the children once a month?

14:32:44   16        A.    I am not agreeable to that.  I think that if

14:32:48   17   this is going to continue under Court Order, I don't

14:32:51   18   think it should be anymore substantial than what the

14:32:55   19   situation is now.  However, if the children would

14:32:58   20   express to me later on that, hey, I would like to spend

14:33:02   21   a night with grandpa -- Pop Pop, sorry, or something of

14:33:05   22   that nature, I would consider that.  Like I said, I'm

14:33:07   23   absolutely willing to put my personal feelings aside

14:33:11   24   for the best interest of the children.

14:33:13   25        Q.    But if the children expressed that desire

14:33:15 1    with the grandfather, you would be okay with that

14:33:18 2    request?

14:33:19 3         A.    No.    I don't think that's sufficient to make

14:33:21 4    the request through grandfather and expect me to

14:33:24 5    believe that's what they had expressed.    This has never

14:33:27 6    been expressed to me personally.

14:33:29 7                   ATTORNEY HARSHBERGER:    I have no further

14:33:30 8    questions.

14:33:31 9                   THE COURT:    Anything else you want to

14:33:32 10   tell me, ma'am?

14:33:33 11                  THE WITNESS:    I guess I would just like

14:33:36 12   to remind the Court that I don't drive and I don't have

14:33:39 13   my license or a car to support transportation nearly

14:33:43 14   two hours away if there was any consideration of

14:33:45 15   changing the transportation agreement.    Other than

14:33:48 16   that, I think that's all that I have today, Your Honor.

14:33:51 17                  THE COURT:    Okay.    And you had no other

14:33:53 18   witnesses?

14:33:53 19                  MS. PICKETT:    No.

14:33:54 20                  THE COURT:    Okay.    Attorney Harshberger,

14:33:55 21   anything else you want to put on?

14:33:56 22                  ATTORNEY HARSHBERGER:    I would like to

14:33:57 23   recall Bruce Hexter regarding an update as far as the

14:34:01 24   two visits that he had.

14:34:03 25                  THE COURT:    Sure.    Stand and raise your

14:34:04  1   right hand, please.

2                         *   *   *

3                    BRUCE HEXTER,

4              called as a witness,

5        having been duly sworn according to law,

6              testified as follows:

7                         *   *   *

8              DIRECT EXAMINATION

14:34:21  9              THE CLERK:  Please be seated.  Please

14:34:23  10  state and spell your name for the Court.

14:34:26  11             THE WITNESS:  Bruce Hexter, B-R-U-C-E,

14:34:29  12  H-E-X-T-E-R.

14:34:32  13             THE COURT:  All right.  Go ahead.

14:34:33  14             ATTORNEY HARSHBERGER:  Thank you, Your

14:34:34  15  Honor.

14:34:34  16  BY ATTORNEY HARSHBERGER:

14:34:35  17       Q.   Bruce, did you get a copy of the Order from

14:34:39  18  the April 7th hearing?

14:34:40  19       A.   Yes, I did.

14:34:41  20       Q.   And did you read that Order?

14:34:43  21       A.   Yes, I did.

14:34:43  22       Q.   And in that Order it said you were to have

14:34:47  23  custody visitation with the children on April 9th, did

14:34:49  24  you have that visit?

14:34:50  25       A.   Yes, I did.

14:34:51  1      Q.    And what did you do during that visit?

14:34:53  2      A.    My first visit I took the kids to Strasburg

14:35:01  3   Rail Road.  We spent the full day there basically.  And

14:35:05  4   when they were done riding the train, they played in

14:35:09  5   the playground that was there.  Got some great pictures

14:35:14  6   with them in the train and in the store playing with

14:35:19  7   the hats in the store for conductors and stuff like

14:35:24  8   that.  And wound up taking them out for dinner that

14:35:28  9   night before I took them home.

14:35:31  10      Q.    Where did you go to dinner?

14:35:33  11      A.    Infinito's Pizza.

14:35:37  12      Q.    What did the children eat?  I guess that

14:35:40  13   answers that question.

14:35:41  14      A.    It's an all you can eat pizza place.

14:35:43  15      Q.    Do they like pepperoni or just cheese?

14:35:46  16      A.    They had some of everything.  They even had

14:35:49  17   the dessert pizzas.

14:35:55  18      Q.    Would you have liked more time with the

14:35:58  19   children?

14:36:00  20      A.    Definitely.

14:36:04  21      Q.    Did the children express to you at that visit

14:36:07  22   they wanted more time with you?

14:36:08  23      A.    They basically said, can we go home to your

14:36:12  24   house, Pop Pop?

14:36:12  25      Q.    Have they been to your house before?

14:36:15  1      A.   Oh, yes.  They've been there plenty of times.

14:36:18  2  Kris would bring them down.  I had them a couple times

14:36:21  3  for a full weekend like Thursday through Monday.

14:36:25  4      Q.   And do you have bedding for them there?

14:36:28  5      A.   Yes.

14:36:28  6      Q.   They have bicycles at your house?

14:36:31  7      A.   Yes, they definitely do and with helmets.

14:36:38  8      Q.   And you took pictures of that event of that

14:36:41  9  day, right?  On 4/9?

14:36:42 10      A.   From 4/9, yes.

14:36:45 11      Q.   Now, did you try to call and comply with the

14:36:50 12  Order of three phone calls per week?  Did you try to

14:36:53 13  make those phone calls?

14:36:55 14      A.   Yes, I did.

14:36:55 15      Q.   Can you explain to the Court, you know, were

14:37:00 16  those phone calls successful?

14:37:01 17      A.   I had one successful phone call during the

14:37:05 18  full month or from the time the court hearing until

14:37:10 19  even this past Monday I attempted to call.

14:37:14 20      Q.   And you were calling either Mondays or

14:37:16 21  Wednesdays?  But I think after today we're going to

14:37:18 22  work it out to Mondays at 6:00.

14:37:20 23      A.   Correct.  In fact, with the phone calls I

14:37:23 24  actually attempted to call once on a Saturday night and

14:37:27 25  I got a text message back from her, weekends are family

14:37:32  1    time.  Do not call me then.

14:37:34  2        Q.   Okay.  But you did get a chance to talk to

14:37:40  3    them one time from April 7th until today's date?

14:37:43  4        A.   Correct.

14:37:43  5        Q.   Other than the two visits that you had?

14:37:45  6        A.   That is correct, one time on the phone.

14:37:46  7        Q.   Okay.  Now, mother testified that the

14:37:52  8    children were crying before they left her care to go

14:37:56  9    with you.  Did you see any signs of the children crying

14:38:01  10   when you saw them?

14:38:02  11       A.   No.  In fact, both times that I got the kids,

14:38:06  12   they ran up to me and gave me a great big hug.  Hi, Pop

14:38:11  13   Pop.  Hi.  I said, well, you guys ready to go?  Yeah.

14:38:15  14   And then I attempted to ask Sara -- the first time it

14:38:19  15   was Easter weekend -- is there any Easter egg hunts

14:38:24  16   around that I can take them to and she would not give

14:38:27  17   me any kind of answer.  I'm not giving you anything was

14:38:30  18   her response.

14:38:31  19       Q.   So the April 9th visit was you wanted to take

14:38:33  20   them on an Easter egg hunt and you asked her if there

14:38:37  21   was anything available?

14:38:38  22       A.   Correct.

14:38:38  23       Q.   But you ultimately decided to take them to

14:38:41  24   the train museum?

14:38:42  25       A.   Because I couldn't find anything around.

| 14:38:44 | 1 | Q. Okay. Did you give them any kind of gifts |
| 14:38:49 | 2 | after that meeting? |
| 14:38:50 | 3 | A. I got them a little train at the train store, |
| 14:38:55 | 4 | a little toy at the train store. |
| 14:38:57 | 5 | Q. What about old Christmas or old birthday |
| 14:39:01 | 6 | gifts? |
| 14:39:01 | 7 | A. I gave them birthday -- it was just prior to |
| 14:39:05 | 8 | [R.H.]'s birthday and I gave them both a Christmas |
| 14:39:09 | 9 | present and I said since I haven't seen you at |
| 14:39:10 | 10 | Christmas, here's a Christmas present for you. And |
| 14:39:14 | 11 | then here's your birthday present, [R.H.], hold off on |
| 14:39:18 | 12 | opening it up until Tuesday. |
| 14:39:21 | 13 | Q. Tuesday would have been his -- |
| 14:39:23 | 14 | A. Tuesday would have been his birthday, |
| 14:39:25 | 15 | correct, after the visit. |
| 14:39:26 | 16 | Q. Okay. And then -- |
| 14:39:28 | 17 | A. And they took the gifts and threw them in the |
| 14:39:31 | 18 | back of the car. |
| 14:39:33 | 19 | Q. And when you say they, who's they? |
| 14:39:35 | 20 | A. Sara and the friend that was with her driving |
| 14:39:38 | 21 | them away. |
| 14:39:39 | 22 | Q. They took the gifts and threw them in the |
| 14:39:41 | 23 | back of the car? |
| 14:39:42 | 24 | A. He took them off the kids and threw them in |
| 14:39:45 | 25 | the back of his car, the gentleman. I don't know his |

14:39:47  1    name.

14:39:48  2         Q.    And then you had another visit.  When was

14:39:50  3    that?

14:39:50  4         A.    I had it on May 14th.

14:39:54  5         Q.    Okay.  And what did you do that day?

14:39:56  6         A.    I'm sorry.  On the first visit I also took

14:39:59  7    them bowling too.

14:40:01  8         Q.    Okay.

14:40:02  9         A.    I forgot about that part.

14:40:03  10        Q.    So bowling, train, and dinner?

14:40:06  11        A.    Correct.

14:40:06  12        Q.    And then the 14th of May you had a visit.

14:40:10  13    Where did you go?

14:40:11  14        A.    I took them to a playground and as they were

14:40:16  15    playing around I looked at [R.H.]'s shoes, saw they

14:40:19  16    were worn out.  I said it looks like you need new

14:40:23  17    shoes.  Let's go buy you some new shoes.  He said okay.

14:40:27  18    I asked [A.P.] if she needed shoes and she said, no.

14:40:30  19    She was good with them.  So we went to the store, went

14:40:33  20    to a mall, found a pair of shoes for him, bought them

14:40:39  21    for him.  After that, we went to the movies.  After the

14:40:44  22    movies, took them to dinner.

14:40:45  23        Q.    What movie did you see?

14:40:48  24        A.    The new minion -- or Sonic the Hedgehog.

14:40:54  25        Q.    Okay.  And did [A.P.] get anything?  You said

14:41:02  1    [R.H.] got shoes.

14:41:04  2        A.   Yes.  She picked out a little toy.  It was

14:41:07  3    toy purse with a toy telephone.  She said, oh, I can

14:41:12  4    have my own telephone, which played music.

14:41:16  5        Q.   All right.  Where did you guys go the eat

14:41:20  6    then?

14:41:20  7        A.   We went to the steakhouse.

14:41:22  8        Q.   And did you take pictures of this outing?

14:41:25  9        A.   I did take pictures of them sitting in the

14:41:29  10   movie theater next to me.  And then afterwards I took

14:41:33  11   pictures of the placemats that they have at the

14:41:39  12   steakhouse that the kids colored on.

14:41:41  13       Q.   I'm going to show you what's marked as

14:41:44  14   identification purposes -- I'm not sure what number

14:41:47  15   we're on, Your Honor -- Intervenors Rebuttal One.

14:41:50  16            THE COURT:  We'll call it Intervenors

14:41:53  17   Number One.  Go ahead.

14:41:57  18            ATTORNEY HARSHBERGER:  I provided a copy

14:42:00  19   for the Court's --

14:42:01  20            THE WITNESS:  You can see a picture of

14:42:02  21   them sitting in the chair at the movies.

14:42:06  22   BY ATTORNEY HARSHBERGER:

14:42:06  23       Q.   Can you briefly weave through this and tell

14:42:08  24   me are these a true and accurate representation of the

14:42:12  25   photos that you took?

36

14:42:13  1        A.    Yes.  They definitely are photos that I took.

14:42:16  2        Q.    And there's eight pictures in there?

14:42:18  3        A.    I believe that's how many.

14:42:19  4        Q.    Let's go through them quickly.  Who's on the

14:42:22  5   first page?

14:42:22  6        A.    First page is the two kids standing in their

14:42:26  7   development holding up the menus that they colored at

14:42:32  8   the steakhouse.

14:42:33  9        Q.    A little artwork?

14:42:35  10       A.    A little bit of artwork that they did.

14:42:38  11       Q.    Next page.

14:42:39  12       A.    Next page is [R.H.] leaning up against me in

14:42:43  13   the chair at the movie theater.

14:42:44  14             THE COURT:  I can see what the pictures

14:42:46  15   are.

14:42:46  16   BY ATTORNEY HARSHBERGER:

14:42:46  17       Q.    And it looks like they are happy and they

14:42:49  18   are --

14:42:51  19       A.    Smiley.

14:42:52  20       Q.    Smiley.  Doesn't look like they are fearful

14:42:56  21   or scared of you in this situation?

14:42:57  22       A.    No.

14:42:57  23       Q.    Okay.

14:42:58  24       A.    And --

14:43:00  25       Q.    He's -- the Judge already said he can see the

14:43:05  1    pictures.

14:43:05  2                    ATTORNEY HARSHBERGER:  I move for the

14:43:06  3    admission of Intervenors Exhibit One.

14:43:09  4                    THE COURT:  Any objections?

14:43:10  5                    THE WITNESS:  No, Your Honor.

14:43:11  6                    THE COURT:  They may be admitted.

14:43:16  7    Anything else?

14:43:16  8    BY ATTORNEY HARSHBERGER:

14:43:16  9        Q.    And on that day, did you again want more time

14:43:19  10   with the children?

14:43:20  11       A.    I would have loved to have more time with

14:43:23  12   them.

14:43:23  13       Q.    And what would you do if you had an overnight

14:43:26  14   with them or a weekend?  What would that allow you to

14:43:31  15   do?

14:43:31  16       A.    Probably wind up being able to take them to

14:43:34  17   an amusement park or something like that or maybe down

14:43:38  18   the shore for the day for a visit.  Visit a friend of

14:43:44  19   mine that the kids both know.  I took -- when I had

14:43:55  20   them prior times, we took them -- my friend and myself

14:44:00  21   took them to two different playgrounds near my house

14:44:04  22   and her house that the kids loved and they actually

14:44:08  23   asked me, hey, when can we go back to those

14:44:11  24   playgrounds?

14:44:12  25       Q.    Did the children mention anything about Kris

14:44:19  1    while they were with you?

14:44:23  2         A.    Mostly that they miss him.

14:44:26  3         Q.    Did [R.H.] make anything for him, for Kris?

14:44:31  4         A.    Yes.  On the second visit at that playground

14:44:37  5    [R.H.] made a Father's Day card and a birthday card for

14:44:43  6    him, which I sent off to him.

14:44:46  7         Q.    And did [A.P.] make anything for him?

14:44:50  8         A.    She asked if she could do it too.  Yeah.

14:44:54  9    Okay.

14:44:54  10        Q.    Okay.

14:44:56  11        A.    So she made one of each for him also,

14:44:59  12   birthday and Father's Day cards since they are both

14:45:03  13   right there together, a day apart.

14:45:06  14        Q.    Has the -- Ms. Pickett's characterization of

14:45:13  15   your guys relationship communication, is that accurate

14:45:16  16   you guys are not communicating well?

14:45:20  17        A.    I would say we're definitely not

14:45:22  18   communicating well.

14:45:24  19        Q.    What in your opinion could help the

14:45:27  20   communication if anything?

14:45:29  21        A.    When I call, she would talk to me prior to

14:45:35  22   even putting the kids on the phone.  Or when I go there

14:45:38  23   to visit, she would at least be communicative instead

14:45:49  24   of telling me basically, you're a bad person.

14:45:52  25        Q.    She said that to you?

14:45:53  1      A.   Yes.

14:45:54  2      Q.   Why would she have said that to you?

14:45:56  3      A.   I have no idea.

14:45:58  4      Q.   What did you do that were --

14:46:00  5      A.   Oh, because I bought them a gift, bought them

14:46:04  6   the shoes.

14:46:05  7      Q.   So knowing that you and her cannot

14:46:08  8   communicate well, would it be okay if there was an

14:46:11  9   Order that spelled out the exact times for the phone

14:46:14  10  calls and the exact times for periods of your

14:46:17  11  visitation?  Would that be -- would that have to work?

14:46:21  12     A.   If that's what it would have to come down to.

14:46:28  13             ATTORNEY HARSHBERGER:  All right.  No

14:46:28  14  further questions.

14:46:29  15             THE COURT:  Questions of this witness,

14:46:31  16  Ms. Pickett?

14:46:33  17             MS. PICKETT:  Yes.  I would just like to

14:46:35  18  clarify --

14:46:36  19             THE COURT:  No, you're not testifying.

14:46:37  20  Do you have questions?

14:46:38  21             MS. PICKETT:  No.  That was part of my

14:46:40  22  question.

14:46:41  23             THE COURT:  Ask him a question.

14:46:42  24             CROSS EXAMINATION

14:46:42  25  BY MS. PICKETT:

14:46:43 1     Q.    So in the temporary Order it was ordered that

14:46:45 2     [A.P.] is to have no contact with [R.H.]'s father, yet

14:46:49 3     you have testified -- well, I guess it's considered

14:46:53 4     testimony at this point that you had [A.P.] make cards

14:46:57 5     to send to [R.H.]'s father.

14:47:01 6     A.    Yes.  She asked if she could.  I only asked

14:47:04 7     [R.H.].

14:47:07 8                    MS. PICKETT:  Okay.  I have no further

14:47:08 9     questions, Your Honor.

14:47:09 10                   THE WITNESS:  And she asked me if she

14:47:11 11    could and I said okay.

14:47:13 12                   THE COURT:  Any other testimony,

14:47:15 13    Attorney Harshberger?

14:47:15 14                   ATTORNEY HARSHBERGER:  Not from Bruce

14:47:18 15    Hexter, just from Kris regarding his availability on

14:47:23 16    phone calls.

14:47:24 17                   THE COURT:  All right.  Mr. Kristoffer

14:47:29 18    Hexter, please, stand and raise your right hand and the

14:47:34 19    clerk will swear you in.

20                               *   *   *

21                        KRISTOFFER HEXTER,

22                        called as a witness,

23              having been duly sworn according to law,

24                     testified as follows:

25                               *   *   *

1          DIRECT EXAMINATION

14:47:48   2               THE CLERK:  Please be seated.  Please

14:47:51   3    state and spell your name for the record.

14:47:54   4               THE WITNESS:  Kristoffer Hexter,

14:47:58   5    K-R-I-S-T-O-F-F-E-R, H-E-X-T-E-R.

14:48:02   6               THE COURT:  All right.  Attorney

14:48:04   7    Harshberger, you got literally five minutes tops.

14:48:07   8               ATTORNEY HARSHBERGER:  Thank you, Judge.

14:48:07   9    BY ATTORNEY HARSHBERGER

14:48:08   10        Q.   Kris, can you explain to the Court your

14:48:13   11   ability to make phone calls from the jail?

14:48:16   12        A.   My ability to make phone calls is limited to

14:48:20   13   two separate block out times per day between 1:15 and

14:48:26   14   3:45 in the afternoon and 5:15 and 8:45 in the evening.

14:48:32   15   It's a first come first serve basis.

14:48:35   16        Q.   And are you requesting that when the children

14:48:38   17   are with grandfather that you be able to make phone

14:48:42   18   calls to both children so that you can talk to the

14:48:48   19   children once a month?

14:48:49   20        A.   Yes.

14:48:52   21               ATTORNEY HARSHBERGER:  No further

14:48:54   22   questions.

14:48:54   23               THE COURT:  Cross-examination of this

14:48:56   24   witness, Ms. Pickett?

14:48:58   25               MS. PICKETT:  I have no questions, Your

42

14:49:00  1    Honor.

14:49:00  2                        THE COURT:  Anything else?

14:49:00  3                        ATTORNEY HARSHBERGER:  No, Your Honor.

14:49:00  4                        THE COURT:  Did you have any rebuttal

14:49:02  5    you wanted to testify to, ma'am?

14:49:04  6                        MS. PICKETT:  No, Your Honor.

14:49:05  7                        THE COURT:  Okay.  All right.  In this

14:49:12  8    matter the Court has taken testimony part of two days

14:49:17  9    over a two or three month period.  It is the final

14:49:21  10   Order in this matter as follows:  The temporary Order

14:49:25  11   of April 7, 2022, in this matter is confirmed in full

14:49:31  12   except with a couple of small changes.  Those small

14:49:37  13   changes are as follows:  Pop Pop, Bruce Hexter's

14:49:47  14   Saturday times will be the second and fourth Saturdays

14:49:51  15   of each month.  An additional change is that the three

14:49:59  16   times per month for Pop Pop to have phone or video or

14:50:02  17   equivalent will be Monday at 6:00 p.m. on the first

14:50:09  18   Monday of each month, the third Monday of each month,

14:50:13  19   and the fifth Monday of each month if there is a fifth

14:50:18  20   Monday.

14:50:18  21                        Mother, father, and Pop Pop,

14:50:22  22   grandfather, will have their communications through

14:50:25  23   OurFamilyWizard.  Grandfather, Bruce Hexter, will

14:50:30  24   within ten days of this Order sign up and pay for the

14:50:34  25   annual fee for OurFamilyWizard and provide the

14:50:38  1    information to father if he can do that through the

14:50:41  2    prison, if he can't, that's okay, and will provide the

14:50:44  3    log in information for mother who will promptly join

14:50:48  4    OurFamilyWizard.  All communications relative to these

14:50:54  5    children will be through OurFamilyWizard.

14:50:59  6              Additionally, mother will give to both

14:51:01  7    father and Pop Pop the portal communication, and if

14:51:05  8    necessary, the password so that they may go to the

14:51:09  9    school portal to receive information, records, and so

14:51:12  10   forth from the childrens school.  Father may exercise

14:51:22  11   his time of talking with [R.H.] only by calling [R.H.]

14:51:35  12   when [R.H.] is with Pop Pop.  Father will continue to

14:51:39  13   have no contact with [A.P.].  Mother will cause an

14:51:48  14   intake to have taken place for a therapist for [A.P.]

14:51:53  15   and/or the family by August 1, 2022.

14:52:05  16             Finally, we schedule a follow up hearing

14:52:11  17   with a date and time to be set forth in just a moment

14:52:14  18   as soon as we look at our calendars.  The purpose of

14:52:18  19   that follow up hearing will be to see how visits are

14:52:22  20   going, how telephone contact is going, and to confirm

14:52:25  21   that a initial intake with a therapist has taken place

14:52:30  22   as ordered in this Court Order today.  If either father

14:52:36  23   or grandfather believe mother has not obeyed the Court

14:52:41  24   Order, either of their counsel may file a petition for

14:52:47  25   contempt, and if the petition is so filed that contempt

14:52:51  1   will be heard at that follow up hearing.

14:52:55  2              The Court wants to make it clear this is

14:52:59  3   a follow up hearing only to ensure things are going

14:53:01  4   well and that this Order is a final Order.

14:53:05  5   Nevertheless, the Court does want to make it very clear

14:53:10  6   to mother that if there is any more games playing by

14:53:17  7   mother on telephone contact or visits, the Court may at

14:53:23  8   the follow up hearing give either father and/or

14:53:28  9   grandfather expanded rights.

14:53:30 10              Go off the record.

         11                       *   *   *

         12              (Whereupon, a discussion was held off

         13   the record.)

         14                       *   *   *

         15

         16              THE COURT:  We'll go back on the

         17   record.

14:53:58 18              The aforesaid follow up hearing will be

14:54:01 19   on September 6, 2022, at 10:00 a.m. in Courtroom 6005.

14:54:08 20   Grandfather, his counsel, and mother will be in person.

14:54:14 21   Father may be by Zoom.  Any other witnesses may be by

14:54:18 22   Zoom.  If things are going well, a written stipulation

14:54:27 23   from all parties would do in lieu of actual appearance,

14:54:32 24   but if that does not happen, the follow up hearing will

14:54:36 25   take place at the date and time aforesaid and everyone

14:54:41  1    will be present as just indicated.

14:54:47  2                    Copy to Attorney Harshberger.  Copy to

14:54:50  3    mother, Sara Pickett at -- why don't you give me your

14:54:50  4    address, ma'am.

14:54:55  5                    MS. PICKETT:  It is 278 Coventry at

14:54:58  6    Waterford York, PA 17402.

14:55:03  7                    THE COURT:  Okay.  Are there any

14:55:05  8    questions?

14:55:08  9                    ATTORNEY HARSHBERGER:  We're just

14:55:11  10   looking at the no contact with [A.P.], would the

14:55:19  11   therapist be agreeable that maybe the therapist could

14:55:24  12   write a letter regarding that contact --

14:55:24  13                   THE COURT:  That's exactly why I have a

14:55:26  14   follow up hearing scheduled.  A letter would be fine.

14:55:29  15                   ATTORNEY HARSHBERGER:  Okay.  Because I

14:55:30  16   don't want to have her bring her in or him in.

14:55:34  17                   THE COURT:  Understood.  Any questions,

14:55:35  18   Ms. Pickett?

14:55:36  19                   MS. PICKETT:  I just wanted to clarify

14:55:38  20   that the points that you mentioned that we'll be

14:55:40  21   covering in the next hearing, that will be listed in

14:55:40  22   the Order --

14:55:43  23                   THE COURT:  You'll get a copy of this

14:55:45  24   Order.

14:55:45  25                   MS. PICKETT:  I just wanted to make sure

                                        46

14:55:46  1   that's listed in the Order.

14:55:48  2            THE COURT:  I understand it's tough to

14:55:50  3   write everything down in the Order.  I had to do that

14:55:51  4   for 39 years as a lawyer and I would miss things so

14:55:54  5   that's why I try to put everything in Order.  You'll

14:55:57  6   get a copy of the Order in a few days or so.

14:55:59  7            MS. PICKETT:  I just want to make sure

14:56:01  8   that I am preparing based on the correct information of

14:56:03  9   what we're addressing in the next one.

14:56:04  10           THE COURT:  And, ma'am, let me just say

14:56:06  11  to you that I understand your problems with the father.

14:56:10  12  He's in jail, you know, he's going to be there for a

14:56:14  13  while.  I get all of that, but the father of these

14:56:18  14  children and Pop Pop are not the same people.  Okay.

14:56:21  15  And you got to understand that.  And if you don't do

14:56:27  16  more to try to encourage a good relationship between

14:56:31  17  these two children and their grandfather, I'll do it

14:56:34  18  and I'll just give him more and more and more time

14:56:38  19  until you get the message; is that clear?

14:56:42  20           MS. PICKETT:  Sure.

14:56:43  21           THE COURT:  Okay.  Thank you.  Everyone

14:56:45  22  is excused.

11:49:45  23                   *   *   *

11:49:45  24       (Whereupon, the hearing was concluded.)

          25                   *   *   *


47

## C E R T I F I C A T I O N

      I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the hearing of the above cause, and that this copy is a correct transcript of the same.


*Emily Riccardi*
_____
EMILY M. RICCARDI
Official Court Reporter