IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA

| | | |
|---|---|---|
| SARA PICKETT,<br>　　　　Plaintiff | : | No. 2021-FC-001007-03 |
| | : | |
| | : | |
| VS | : | |
| | : | |
| KRISTOFFER HEXTER,<br>　　　　Defendant | : | |
| | : | |
| | : | |
| VS | : | |
| | : | |
| BRUCE HEXTER,<br>　　　　Intervenor | : | |

(Custody Trial-Day 1)

York, Pa., Thursday, April 7, 2022

Before the Honorable N. Christopher Menges, Judge

APPEARANCES:

　　　　Josh Bodene, Esquire
　　　　For the Plaintiff

　　　　Joshua A. Harshberger, Esquire
　　　　For the Defendant
　　　　For the Intervenor

TRANSCRIPT OF PROCEEDINGS

Reported by:

Sherri A. Reitano, RPR
Official Court Reporter

1　－　Ex 2

INDEX TO WITNESSES

<u>FOR THE FATHER/INTERVENOR</u>                     <u>PAGE</u>

KRISTOFFER HEXTER

  Direct by Attorney Harshberger          20

  Cross by Attorney Bodene               37

  Redirect by Attorney Harshberger        49

  Recross by Attorney Bodene             52

BRUCE HEXTER

  Direct by Attorney Harshberger          54

  Cross by Attorney Bodene               68

  Redirect by Attorney Harshberger        72

  Recross by Attorney Bodene             --

PROCEEDINGS HELD ON THURSDAY, APRIL 7, 2022

\*   \*   \*

THE COURT:  Good morning.

ATTORNEY HARSHBERGER:  Good morning, Your Honor.

ATTORNEY BODENE:  Good morning, Your Honor.

THE COURT:  We are here for a custody trial.  So before I interview the child, let's do a couple of preliminary things.  I got the stipulation of facts.  Thank you very much.  I appreciate that.

Can we possibly have a stipulation as to what father's criminal record is?

ATTORNEY HARSHBERGER:  Yes.

THE COURT:  I saw in the file somewhere it includes involuntary deviate sexual intercourse, statutory assault or whatever.  He's going to have a minimum I think 54 months or something like that.

ATTORNEY HARSHBERGER:  Yes, there is a plethora of charges.  And then subsequently after those charges and conviction, he did have a risk of harm hearing in Lebanon County.  That had all of those charges which he was determined not to be a risk of harm.  But I could find one of his filings, Your Honor,

09:14:49  1    or criminal abuse history verification or we can fill

09:14:53  2    one out.

09:14:53  3              THE COURT:  You know, it's -- that leads

09:14:59  4    into my next question, Attorney Harshberger, which is

09:15:02  5    simply what is it?  From the pre-trial conference my

09:15:07  6    notes indicate father simply wants advised of available

09:15:14  7    records of the children and so forth.

09:15:16  8              ATTORNEY HARSHBERGER:  Yes.  And phone

09:15:17  9    contact.

09:15:18  10             THE COURT:  I'm sorry.

09:15:19  11             ATTORNEY HARSHBERGER:  And some phone

09:15:20  12   contact.

09:15:20  13             THE COURT:  Some phone contact.

09:15:23  14             ATTORNEY HARSHBERGER:  We are asking

09:15:23  15   very minimal for father until he's released from

09:15:26  16   incarceration which at that point in time would be --

09:15:29  17   he would have to file to modify.  The real crux of

09:15:33  18   today's issue is grandfather's intervention status.

09:15:38  19             I believe there are -- he was granted

09:15:40  20   standing at the conference and then still an open issue

09:15:43  21   as to the older child if we are going to keep the older

09:15:49  22   child on or argument is obviously estoppel and in loco

09:15:56  23   parentis.  That was in loco parentis.  Grandfather

09:15:56  24   has -- he has been treating this child as his

09:16:00  25   grandchild for the life of the child and we believe

09:16:01  1    that that custody order shouldn't be changed or

09:16:05  2    altered.  And that grandfather should be awarded some

09:16:09  3    visitation.  And our visitation request was minimal,

09:16:13  4    one weekend a month and one week in the summer for

09:16:22  5    vacation if grandfather is able to execute that or, you

09:16:26  6    know, with proper notice.

09:16:28  7              THE COURT:  That would be with both

09:16:29  8    children?

09:16:29  9              ATTORNEY HARSHBERGER:  Yes.

09:16:30 10              And the holiday, Your Honor.  I talked

09:16:33 11    to him about this a little bit.  But -- and he's not

09:16:36 12    like I don't want Christmas day, I don't want

09:16:39 13    Christmas.  He's okay with the weekend after Christmas.

09:16:42 14    Let me just get that weekend.  And I really didn't talk

09:16:46 15    to him about Thanksgiving, Easter.  But I figure if

09:16:48 16    he's already getting them one weekend a month, that

09:16:50 17    should be sufficient for him.

09:16:51 18              He's not looking to supplant mom or dad,

09:16:54 19    just looking to, A, see his grandchildren again but

09:16:59 20    also foster communication between father and the

09:17:01 21    children.  So he could schedule calls with them if the

09:17:05 22    children are at his house.  He can phone call SCI and

09:17:09 23    see about getting some contact that way.

09:17:11 24              THE COURT:  Let's talk about does [A.P.]

09:17:18 25    know that father is not her bio father?

09:17:23 1                     THE FATHER:  Depends on --

09:17:25 2                     THE MOTHER:  Yes, Your Honor.

09:17:26 3                     THE COURT:  Okay.  But does she think of

09:17:32 4      father as her father?  Did she call him daddy, all that

09:17:36 5      kind of thing?

09:17:37 6                     THE MOTHER:  She was required to call

09:17:38 7      him daddy.  She does not consider him to be a father.

09:17:41 8                     THE COURT:  How long was she living with

09:17:49 9      psychological father, the father in this case, before

09:17:53 10     he was incarcerated?

09:17:55 11                    THE MOTHER:  We were together until

09:17:57 12     April of 2016.  After that, there was a small period of

09:18:00 13     time where he had her up until the investigation for

09:18:03 14     the child endangerment at which time I made the

09:18:05 15     decision to remove her from the situation.

09:18:07 16                    However, after I had filed custody, in

09:18:11 17     conciliation we had established that he did not have

09:18:13 18     legal rights to her.  However, she was then added back

09:18:15 19     to the custody case and he has since had essentially

09:18:20 20     50/50 custody.

09:18:22 21                    ATTORNEY HARSHBERGER:  I would say, Your

09:18:29 22     Honor, just to --

09:18:30 23                    THE COURT:  Go ahead.

09:18:30 24                    ATTORNEY HARSHBERGER:  In 2018, the

09:18:32 25     custody order out of Lebanon County granted father

09:18:37 1  primary custody of both children. So that was in

09:18:42 2  effect until father's incarceration -- recent

09:18:45 3  incarceration due to his current charges.

09:18:47 4          ATTORNEY BODENE:  I believe the -- let's

09:18:55 5  see here. The 2019 order -- that is correct, Your

09:19:03 6  Honor. I apologize.

09:19:05 7          THE COURT:  So in 2018 or 2019, Lebanon

09:19:08 8  County gave father 50/50 of both children, the subject

09:19:12 9  of father being psychological father in loco parentis,

09:19:18 10  whatever word you want to use, hasn't that really been

09:19:20 11  decided by Lebanon County and aren't I bound by that?

09:19:25 12          THE MOTHER:  I think it is a much more

09:19:29 13  complex situation than that. The 2019 -- the

09:19:33 14  January 2019 agreement, it was an agreement actually.

09:19:35 15  And this came about because I had a protection order on

09:19:38 16  father for me and both children for no contact for all

09:19:41 17  three of us due to child abuse and for domestic

09:19:44 18  violence and stalking and some other issues that had

09:19:46 19  come about. Approximately four months into this, Judge

09:19:49 20  Kline simply decided that we were no longer going to be

09:19:55 21  abiding by the protection order and I could either go

09:19:55 22  back to the prior custody order or go to jail that day,

09:19:58 23  which obviously is not a decision that I can make. I

09:20:01 24  can't protect my children if I'm in jail. So that

09:20:04 25  decision was made.

09:20:04 1          From that point on, my -- none of the

09:20:08 2    child safety issues were allowed to be addressed in

09:20:10 3    court.  And I had decided by the time that we had

09:20:13 4    reached the final custody hearing, that that was

09:20:17 5    probably the best that I was going to get.

09:20:20 6          THE COURT:  Well, I think it is res

09:20:25 7    judicata.  I think father's being the psychological

09:20:28 8    father, I think it has been decided by Lebanon County.

09:20:33 9    I think I'm stuck with that whether I like it or not.

09:20:36 10   But I'll hear anything that you have to say, Attorney

09:20:38 11   Bodene.

09:20:38 12         ATTORNEY BODENE:  Thank you, Your Honor.

09:20:39 13   We would object to his being psychological father.  We

09:20:42 14   do not believe it is res judicata.  It is not something

09:20:45 15   that the Court has ever actually overtly ruled on.

09:20:47 16   There has been a lot of litigation, some of which has

09:20:51 17   included both kids, some of which included one kid.

09:20:55 18   Honestly, it is a mess if I can put it that way and

09:20:57 19   needs to be clarified.

09:21:00 20         The main polestar is whether it is in

09:21:03 21   [A.P.]'s best interest to have Mr. Hexter as her

09:21:08 22   psychological father.  And our argument that we hope to

09:21:11 23   flush out through testimony is because of his criminal

09:21:15 24   situation, the fact that he won't be physically

09:21:18 25   available to parent at the very earliest for another

09:21:22  1    four years, and most likely in my experience probably

09:21:24  2    more likely for another nine years.  How could it

09:21:29  3    possibly be in her best interest for that to be the

09:21:32  4    case?

09:21:33  5                    THE COURT:  Were either of these

09:21:34  6    children the victims of the --

09:21:36  7                    ATTORNEY BODENE:  Not of the involuntary

09:21:41  8    deviate sexual intercourse.  But yes, the endangering

09:21:43  9    welfare of children which he was convicted for.  He

09:21:46 10    pled to back in 2018.  He was on probation for that.

09:21:50 11    And the IDSI was actually a violation of that

09:21:56 12    probation.

09:21:56 13                    THE COURT:  And a new charge?

09:21:58 14                    ATTORNEY BODENE:  Yes, Your Honor.

09:21:59 15                    THE COURT:  Okay.  All right.  There is

09:22:02 16    nothing simple about this, is there?

09:22:03 17                    ATTORNEY BODENE:  No, Your Honor.

09:22:04 18                    ATTORNEY HARSHBERGER:  So I mean --

09:22:06 19                    THE COURT:  Go ahead.

09:22:07 20                    ATTORNEY HARSHBERGER:  We have an order

09:22:09 21    from January 23rd of 2019 which made the December 7,

09:22:17 22    2018, a permanent order which the parties have shared

09:22:19 23    legal custody of the two children.

09:22:22 24                    These are the two children that are at

09:22:24 25    issue.  I believe that that is a settled case and not

09:22:30  1    to uproot the custody that has been occurring since

09:22:34  2    2018 and prior when they lived together.  This would

09:22:38  3    actually be detrimental to the child saying you no

09:22:41  4    longer have a father.

09:22:42  5               THE COURT:  That's a separate issue.

09:22:44  6    Whether it is in [A.P.]'s best interest to whatever

09:22:49  7    rights may be with father is a little bit of a separate

09:22:51  8    issue as to whether he's psychological father of her.

09:22:57  9    It is a little like standing.  It is a separate issue.

09:23:00 10               It does not necessarily mean -- it is

09:23:02 11    not necessarily dictating what the rights of the parent

09:23:05 12    will be.  All right.  And so let's try to do a full 360

09:23:14 13    here.

09:23:15 14               What is mother's position then on

09:23:18 15    both -- well, start with what is her position on father

09:23:21 16    having phone access and information, not joint legal

09:23:30 17    custody, but information and records and such?

09:23:32 18               ATTORNEY BODENE:  As far as [R.H.], the

09:23:34 19    younger child, she has no objection to that.  She would

09:23:36 20    just ask that the phone contact be scheduled so that

09:23:39 21    they can know when it is going to occur.  She has no

09:23:42 22    problem with that.

09:23:44 23               As far as [A.P.], the older child, she

09:23:47 24    does object based on the psychological parent issue.

09:23:50 25    And then as far as paternal grandfather, her position

09:23:53 1    is and has always been that she has no problem with

09:23:57 2    there being a relationship.  She acknowledges there has

09:23:59 3    been a normal grandparent relationship.

09:24:01 4                    What she objects to is the court-ordered

09:24:03 5    mandated time of partial custody.  That greatly exceeds

09:24:07 6    what he has ever exercised or asked for in the past.

09:24:23 7                    THE COURT:  Okay.

09:24:24 8                    ATTORNEY BODENE:  Could I add just one

09:24:25 9    more thing, Your Honor?

09:24:25 10                   THE COURT:  We are in preliminary

09:24:26 11   matters.  So please go ahead.

09:24:28 12                   ATTORNEY BODENE:  Just while we are sort

09:24:30 13   of honing in on the issues just to, again, my

09:24:34 14   understanding per our conversation pre-trial is that

09:24:37 15   all contempts have been withdrawn.  So those are not on

09:24:39 16   the table.

09:24:42 17                   I have provided my proposed exhibits to

09:24:44 18   opposing counsel.  And with permission, I'll approach

09:24:47 19   and provide to the Court my proposed exhibits as well.

09:24:50 20                   THE COURT:  Absolutely.  Same for you,

09:24:52 21   Attorney Harshberger.

09:24:59 22                   ATTORNEY HARSHBERGER:  I'll need to mark

09:25:01 23   them, Your Honor, collectively as 1 and 2.

09:25:36 24                   THE COURT:  You know, Attorney

09:25:39 25   Harshberger, exhibits are to be premarked.

09:25:41 1          ATTORNEY HARSHBERGER:  I apologize, Your

09:25:42 2 Honor.

09:25:42 3          THE COURT:  Let the record reflect I've

09:25:44 4 got copies of both counsels' proposed exhibits.

09:25:47 5 Anything else of a preliminary nature?

09:25:51 6          ATTORNEY HARSHBERGER:  I'm not sure.

09:25:52 7 Did we -- my position on the estoppel or the parental

09:25:59 8 of father, my argument is this is a separate matter.

09:26:03 9 This is from at least no later than 2018 that father

09:26:06 10 was granted custody of both children.  To reopen that I

09:26:11 11 think would be barred by res judicata.  And we had many

09:26:19 12 other, many other court appearances and mother has not

09:26:24 13 raised this issue until today.

09:26:26 14          THE COURT:  Let me ask another question

09:26:28 15 on that.  When is the last time that [A.P.] had any

09:26:31 16 contact with bio father?

09:26:34 17          ATTORNEY HARSHBERGER:  That would have

09:26:35 18 been August of 2021 whenever before he was

09:26:38 19 incarcerated.

09:26:39 20          THE COURT:  No.  [A.P.] of bio father.

09:26:42 21          ATTORNEY HARSHBERGER:  My fault.

09:26:45 22          ATTORNEY BODENE:  I'm sorry.  Biological

09:26:50 23 father.

09:26:50 24          THE COURT:  I shouldn't use bio.  I

09:26:52 25 confused both counsel.  I apologize.  Biological

father.  We use that term in dependency court all of

the time.  I apologize.  When is the last time [A.P.]

had any contact with her biological father whose name I

don't even know?

ATTORNEY BODENE:  Never, Your Honor.

ATTORNEY HARSHBERGER:  He says never

also.

THE COURT:  Well, I will just let you

know subject to hearing whatever I'm going to hear, I

am at this point strongly inclined to find that father

is the psychological father if for no other reason

that's already been determined by Lebanon County.

Plus, if she hasn't seen bio father,

biological father, ever, I think in loco parentis kicks

in big time.  So I'll hear what you have to present,

Attorney Bodene.  But I think that probably that horse

has gotten out of the gate already.

ATTORNEY BODENE:  Your Honor, just to

clarify our position, as I reviewed the docket from

Lebanon County and orders, while we obviously fully

acknowledge January '19 and March '19 order in which

Mr. Kristoffer Hexter has custody of both children, I

didn't see ever an explicit mention by the Court on

this specific issue.

THE COURT:  I hear you.  And I want to

09:28:14  1    make it clear just because I'm leaning towards father

09:28:19  2    being a psychological father does not necessarily mean

09:28:22  3    if I heard testimony appropriate that I might not make

09:28:27  4    the children's rights different.  Okay.  That does not

09:28:31  5    preclude that possibility.

09:28:33  6             ATTORNEY BODENE:  Understood.

09:28:34  7             THE COURT:  It is a little like

09:28:35  8    standing.  You only get to first base.  You haven't

09:28:38  9    crossed the plate and gotten your run.  Okay.

09:28:43 10             ATTORNEY BODENE:  If I may, Your Honor.

09:28:44 11             THE COURT:  Sure.

09:28:44 12             ATTORNEY BODENE:  Your Honor, if you

09:28:46 13    would indulge, and I appreciate it, just one more

09:28:47 14    point.  I would disagree with counsel.  My client has

09:28:50 15    objected to this issue in the past.  This is not the

09:28:53 16    first time we are -- you look through the docket.

09:28:56 17    Again, there are times when [A.P.] is included, times

09:28:59 18    when [A.P.] is not included.  And frankly, I think

09:29:02 19    there is a lot of confusion.  Our position is that it

09:29:06 20    was never really ironed out.  But I'll leave that for

09:29:09 21    the Court.

09:29:10 22             THE COURT:  Okay.  Anything else of a

09:29:16 23    preliminary nature before I interview [A.P.]?

09:29:19 24             ATTORNEY HARSHBERGER:  No.

09:29:19 25             THE COURT:  Attorney Harshberger, I'm

| | |
|---|---|
| 09:29:20 1 | fully aware of your request that she not see father in |
| 09:29:25 2 | prison orange.  So I'm having my tipstaff bring her |
| 09:29:30 3 | around through the private entrance to go into my jury |
| 09:29:33 4 | room back here so she is not going to walk passed him. |
| 09:29:39 5 | ATTORNEY HARSHBERGER:  Father would love |
| 09:29:41 6 | to see her.  But after consulting with him, I think it |
| 09:29:45 7 | would be better that she wouldn't seen him in orange. |
| 09:29:47 8 | THE COURT:  I assume counsel wants to be |
| 09:29:49 9 | present during the interview of [A.P.]? |
| 09:29:51 10 | ATTORNEY BODENE:  Yes, Your Honor. |
| 09:29:53 11 | THE COURT:  Without further ado, let's |
| 09:29:53 12 | go back to the jury room with the court reporter. |
| 09:29:58 13 | Frank, bring her around the private entrance to the |
| 09:30:04 14 | jury room, please. |
| 15 | (The Court interviewed [A.P.] in the |
| 16 | jury room with counsel present.  The testimony was |
| 09:30:06 17 | stenographically recorded but not transcribed.) |
| 09:30:06 18 | (The proceedings continued in the |
| 10:20:24 19 | courtroom.) |
| 10:20:25 20 | THE COURT:  Let the record reflect the |
| 10:20:28 21 | Court did interview [A.P.].  Very intelligent and |
| 10:20:32 22 | articulate young lady.  Taught her a new word, |
| 10:20:37 23 | loquacious.  I tried to explain to her she was a little |
| 10:20:39 24 | bit that way.  At any rate, we had a great chat. |
| 10:20:45 25 | After talking with [A.P.], I talked to |

your counsel.  I have some pretty strong leanings on where I think this case should go, and I want your counsel to talk to each of you and see if you can't reach an agreement.

Let me start at the back end.  Main reason I'd like you to reach an agreement is because I think long term the best interest of these children would be for mother and Pop Pop to get a better relationship with each other.  We talked about maybe [A.P.] getting some counseling or whatever because she's got some things to deal with.

She asked, you know, why she can't know her biological father.  She's got some questions out there that I think some therapy would be excellent for her.

But my leanings are very simple in that there would not be any contact between father and [A.P.].  Of course, phone contact between [R.H.] and his father would be fine.  Of course, father would get information; educational, medical, all those information things for both children.  That's pretty much standard stuff there.

And that for grandfather, that he would get maybe eight hours once a month or once every four weeks.  I mean [A.P.], you know, I mean she called him

Pop Pop.  But she wasn't real eager to spend a lot of time with him.  But I think with some time and as the relationship builds, that might change.  And frankly, I would like to see it change because grandparents are important for children.

I revealed to your attorneys, I have seven grandchildren.  So I know a little something about being a grandfather.  But, of course, while [A.P.] would be with grandfather, there would be no contact between father and [A.P.] while she is there.  And the thought being maybe with time, [A.P.] would be more open to spend a little more time with grandfather.  That would require a petition to modify.

I'm not going to try to predict the future at this point.  I would certainly be open or negotiated with mother without having to come to court, that's ideal.  That eight hours on Saturday or Sunday once every month or once every four weeks, that would be it.  There would be no summer vacation, none of that thing.

But again, the hope would be that that would build into more as time goes on and as [A.P.] gets older and she has some therapy so she can deal with some of these issues.  It's probably pretty difficult for any of you to try to get into [A.P.]'s

17

10:24:05 1  mind.  I spent some substantial time with her, and I
10:24:07 2  think got into her mind pretty well.

10:24:09 3  She has got some confusion on biological
10:24:13 4  father, brother's father.  How all that interacts, Pop
10:24:17 5  Pop.  She got some things to sort out.  And I
10:24:21 6  definitely think some therapy there would be a big
10:24:24 7  help.

10:24:27 8  Sometimes therapists come up with
10:24:29 9  recommendations that there might be a therapeutic
10:24:33 10  letter writing between [A.P.] and her father.  You
10:24:37 11  know, who knows what the therapist might come up with.
10:24:41 12  I wouldn't order that in advance.  But that certainly
10:24:46 13  could be something that either the parties would agree
10:24:48 14  to or father or grandfather could bring in a
10:24:51 15  modification later.  But that's where I'm leaning.  I'm
10:24:54 16  leaning pretty strongly.  Each of your attorneys tried
10:24:58 17  to persuade me more their way and they both failed.

10:25:03 18  All due respect, they did a good job.
10:25:06 19  I'm leaning that way.  Quite frankly, I'm leaning
10:25:08 20  pretty hard because there is nothing to be gained and a
10:25:13 21  lot to be lost by spending the next couple of hours
10:25:17 22  having everybody trash everybody else because mom,
10:25:22 23  grandpa, Pop Pop, and eventually dad at least are going
10:25:30 24  to have to deal with each other at weddings, funerals,
10:25:32 25  bar mitzvahs, and who knows what, graduations for many,

many years.  And those are all going to go better and
these children are going to thrive better if you can
let the past be in the past and try to get along a
little better and try to go on into the future.  So
that is best done if there is a settlement reached.

　　　　　So I'm going to let your attorneys talk
to each of you and do a little arm -- not arm twisting,
a little convincing and see if you can come up with an
agreement.  Counsel, let my tipstaff, the short guy
here, Frank, know when you need me for more testimony
or for a stipulation, whichever.  Okay.

　　　　　ATTORNEY BODENE:  Thank you, Your Honor.

　　　　　ATTORNEY HARSHBERGER:  Thank you.

　　　　　THE COURT:  Good luck.

　　　　　ATTORNEY BODENE:  Thank you.

　　　　　(Recess.)

　　　　　THE COURT:  Okay.  All right.  I
understand we are going to go forward with the trial.

　　　　　ATTORNEY BODENE:  Yes, Your Honor.

　　　　　THE COURT:  And I already have your
joint stipulation of facts.  Have counsel talked about
what order to have witnesses be presented?

　　　　　ATTORNEY BODENE:  I believe Attorney
Harshberger is in agreement that Kristoffer Hexter
should be first because he's from SCI and would be the

11:01:54  1    most difficult to bring him back if we have to come

11:01:57  2    back.

11:01:58  3                    THE COURT:  So you're ready to have

11:02:03  4    father testify?

11:02:04  5                    ATTORNEY HARSHBERGER:  Yes.

11:02:04  6                    THE COURT:  Okay.  Please stand and

11:02:12  7    raise your right hand.  You can testify from right

11:02:13  8    there.

11:02:14  9                         *    *    *

        10                    KRISTOFFER HEXTER,

        11              called as a witness

        12        having been duly sworn according to law,

        13              testified as follows:

11:02:20 14                         *    *    *

11:02:20 15                    THE CLERK:  Please be seated.  Please

11:02:25 16    state and spell your first and last name.

11:02:26 17                    THE CHILD:  Kristoffer Hexter,

11:02:29 18    K-r-i-s-t-o-f-f-e-r, H-e-x-t-e-r.

11:02:35 19                    THE COURT:  All right.  Attorney

11:02:37 20    Harshberger, go ahead.

        21                    ATTORNEY HARSHBERGER:  Thank you, Your

        22    Honor.

        23                         *    *    *

11:02:39 24                    DIRECT EXAMINATION

11:02:39 25    BY ATTORNEY HARSHBERGER:

| | | |
|---|---|---|
| 11:02:40 | 1 | Q. Good morning, Kris. How are you doing today? |
| 11:02:42 | 2 | A. I'm doing well. |
| 11:02:43 | 3 | Q. And you understand why you're here today? |
| 11:02:45 | 4 | A. Yes. |
| 11:02:46 | 5 | Q. What is your understanding of what we are |
| 11:02:48 | 6 | doing today? |
| 11:02:48 | 7 | A. Establishing certain parental rights and |
| 11:02:52 | 8 | grandparent rights for myself and my father for both of |
| 11:02:56 | 9 | my children. |
| 11:02:57 | 10 | Q. You're currently -- where are you currently |
| 11:02:59 | 11 | housed at? |
| 11:03:00 | 12 | A. SCI Phoenix. |
| 11:03:07 | 13 | Q. How long are you scheduled to be there? |
| 11:03:10 | 14 | A. 54 months. |
| 11:03:11 | 15 | Q. What is your parole date? |
| 11:03:14 | 16 | A. February 13th, 2026. |
| 11:03:16 | 17 | Q. Now, if you could, just give us a brief |
| 11:03:23 | 18 | history of this case. I guess -- well, let me |
| 11:03:29 | 19 | rephrase. How many children are involved in the case? |
| 11:03:34 | 20 | A. Two. |
| 11:03:34 | 21 | Q. What are their names? |
| 11:03:36 | 22 | A. [A.P.] and [R.H.]. |
| 11:03:37 | 23 | Q. And how old is [A.P.]? |
| 11:03:39 | 24 | A. Eight. |
| 11:03:39 | 25 | Q. And how old is [R.H.]? |

11:03:41 1      A.   Six.

11:03:42 2      Q.   And is [A.P.] your child biologically?

11:03:46 3      A.   Biologically, no.

11:03:49 4      Q.   Can you explain to me when you first met

11:03:51 5  [A.P.]?

11:03:52 6      A.   At birth.

11:03:53 7      Q.   So were you with mother -- and who is the

11:03:57 8  mother?

11:03:58 9      A.   I was with mother in the delivery room and

11:04:00 10 mother is Sara Pickett.

11:04:02 11     Q.   Were you together with mother prior to

11:04:06 12 [A.P.]'s birth?

11:04:06 13     A.   Yes, for a few months.

11:04:08 14     Q.   And did you assist mother in prenatal care?

11:04:13 15     A.   Towards the end, yes.

11:04:15 16     Q.   And so she was seven to nine months pregnant

11:04:21 17 when you first met her?

11:04:22 18     A.   Correct.

11:04:22 19     Q.   And were you moved in with Sara at the time?

11:04:25 20     A.   She was moved in with me.

11:04:26 21     Q.   And you and her, did you take her to the

11:04:32 22 hospital for birth?

11:04:33 23     A.   Yes.

11:04:33 24     Q.   Now when [A.P.] was born, did you treat

11:04:38 25 [A.P.] as your child?

11:04:39  1    A.    I did.

11:04:40  2    Q.    And were you and Sara living together?

11:04:43  3    A.    Yes.

11:04:44  4    Q.    When did you and Sara separate?

11:04:46  5    A.    Roughly a year after my son's birth.

11:04:50  6    Q.    And so do you know the date or year?

11:04:54  7    A.    It was around April 2016.

11:04:57  8    Q.    So [A.P.] was about three years old when you

11:05:01  9   separated?

11:05:01 10    A.    That's correct.

11:05:02 11    Q.    And at that time, what was the custodial

11:05:07 12   arrangement of both children?

11:05:08 13    A.    At that time, I was still employed at the

11:05:13 14   Army Depot.  I would have the children on weekends,

11:05:17 15   every weekend from Thursday -- Thursday morning until

11:05:21 16   Sunday morning.

11:05:22 17    Q.    And how long did that arrangement last, from

11:05:26 18   2016 until when?

11:05:27 19    A.    Until the most recent custody order to where

11:05:32 20   I gained primary custody.

11:05:36 21    Q.    So there was a filing for custody in Lebanon

11:05:40 22   County?

11:05:40 23    A.    Correct.

11:05:41 24    Q.    And through the agreement and order of court,

11:05:45 25   you were essentially granted primary custody; is that

11:05:49 1     my understanding?

11:05:50 2        A.   Yes.

11:05:50 3        Q.   What was your level of -- what was your days?

11:05:54 4        A.   Friday afternoon at 1:00 until Tuesday

11:05:58 5     afternoon at 1:00.

11:06:00 6        Q.   And during this time, did the children go to

11:06:03 7     school at your school district?

11:06:06 8        A.   Yes.

11:06:07 9        Q.   What school district was that?

11:06:10 10        A.   North Lebanon.

11:06:12 11        Q.   And so how is [A.P.] doing in school?

11:06:14 12        A.   She was doing particularly well when she was

11:06:19 13     going brick and mortar school, kindergarten.  For her

11:06:22 14     first grade year, mother transferred to an online

11:06:27 15     service in which she was struggling a little bit just

11:06:32 16     because of a little bit of attention span issue.

11:06:38 17        Q.   Now, when you were doing the online school,

11:06:43 18     you and mom were both assisting the child in educating

11:06:46 19     her, correct?

11:06:47 20        A.   I cannot tell you what mother was doing.

11:06:51 21        Q.   I mean what were you doing?

11:06:53 22        A.   I was logging into courses and I was sitting

11:06:55 23     with her while she was online.  Basically monitoring

11:07:00 24     her class until class time was finished.

11:07:02 25        Q.   Now for both children, did you attend medical

11:07:06  1    appointments for them?

11:07:07  2        A.    Yes.

11:07:09  3        Q.    You were at the birth of [A.P.].  Were you at

11:07:09  4    the birth of [R.H.]?

11:07:10  5        A.    Yes.

11:07:10  6        Q.    And did you go to their normal checkups?

11:07:13  7        A.    Yes.

11:07:13  8        Q.    And then further on out, you went to their

11:07:16  9    yearly checkups?

11:07:17 10        A.    Correct.

11:07:17 11        Q.    Was there any counseling established for the

11:07:21 12    children when you had primary in 2019?

11:07:24 13        A.    Yes.  I had home-based family counseling with

11:07:28 14    a counselor traveling to our home, and we had on

11:07:32 15    average two hour sessions per week.

11:07:34 16        Q.    And how did that counseling come into play?

11:07:37 17    I mean what caused counseling to occur?

11:07:40 18        A.    Behavioral issues within the children.

11:07:43 19        Q.    And were there involvement with Children and

11:07:45 20    Youth agencies?

11:07:46 21        A.    Yes, there was several times.

11:07:48 22        Q.    And which county?

11:07:49 23        A.    Lebanon.

11:07:50 24        Q.    And did they advise you to get the children

11:07:54 25    in counseling?

25

11:07:54  1        A.    They had referenced and said it may be a good

11:07:59  2    idea.

11:07:59  3        Q.    In any of those involvements with Children

11:08:04  4    and Youth, was there anything either founded or

11:08:06  5    indicated against you and/or mother?

11:08:08  6        A.    Not to my knowledge for either party.

11:08:14  7        Q.    Now during your time with the children, did

11:08:18  8    your father ever, even from birth, was your father ever

11:08:25  9    involved?

11:08:26 10        A.    Yes, sir.

11:08:26 11        Q.    Who is your father?

11:08:27 12        A.    Bruce Hexter.

11:08:29 13        Q.    Where is he seated?

11:08:30 14        A.    To my left.

         15            ATTORNEY HARSHBERGER:    Let the record

11:08:32 16    reflect he has identified the Intervenor, Mr. Bruce

11:08:35 17    Hexter.

11:08:36 18    BY ATTORNEY HARSHBERGER:

11:08:37 19        Q.    So can you explain a little bit how Bruce was

11:08:41 20    involved with the children?  Was he at any of the

11:08:45 21    children's births?

11:08:47 22        A.    He arrived after the birth but still while in

11:08:50 23    the hospital.

11:08:51 24        Q.    Is that for both children?

11:08:53 25        A.    Yes.

11:08:53 1   Q.   And so he met [A.P.] the day she was born?

11:08:56 2   A.   Day after.

11:08:59 3   Q.   And then he met [R.H.] shortly after his

11:09:02 4   birth?

11:09:02 5   A.   That's correct.

11:09:03 6   Q.   And then during you and Sara together, was

11:09:09 7   Mr. -- was Bruce -- did he come visit?

11:09:12 8   A.   Yes, he was involved.

11:09:13 9   Q.   Where were you and Sara residing at again?

11:09:16 10   A.   In Lebanon County, Johnstown more

11:09:18 11   specifically.

11:09:19 12   Q.   And how far away did Bruce live from your

11:09:22 13   residence?

11:09:23 14   A.   About an hour and 15 minutes.

11:09:25 15   Q.   And so how often do you believe, if you can

11:09:29 16   recall, when the children were young and you and Sara

11:09:33 17   were together, how often did Bruce come and visit his

11:09:36 18   grandchildren?

11:09:36 19   A.   On average once every month to every other

11:09:41 20   month.

11:09:41 21   Q.   Okay.  And how long would he stay?

11:09:44 22   A.   At my residence, he would stay about a day.

11:09:48 23   Q.   Okay.  Would he help to change diapers?

11:09:51 24   A.   Yes.

11:09:52 25   Q.   Would he help bathe the children?

11:09:54 1      A.    No.   He was not involved in the bathing

11:09:58 2   process, but he was involved in feeding.

11:10:00 3      Q.    Feed and change them?

11:10:02 4      A.    Yes.

11:10:02 5      Q.    Okay.   Would he hold them?

11:10:05 6      A.    Absolutely.

11:10:06 7      Q.    Did he show affection towards the children?

11:10:08 8      A.    Yes.

11:10:08 9      Q.    Did he seem to show a different or favoritism

11:10:13 10  between [R.H.] and [A.P.]?

11:10:15 11     A.    No.

11:10:15 12     Q.    Did he seem to show any difference that

11:10:18 13  [A.P.] wasn't biologically his?

11:10:21 14     A.    No.

11:10:22 15     Q.    So based upon -- to you did he treat both

11:10:26 16  children equally as if they were his own biological

11:10:29 17  grandchildren?

11:10:30 18     A.    Yes.

11:10:30 19     Q.    Now after you and Sara separated, did you

11:10:35 20  still reside in Lebanon?

11:10:36 21     A.    Yes, I did.

11:10:36 22     Q.    And did Bruce -- did you rely on Bruce more

11:10:43 23  now because you didn't have Sara?

11:10:44 24     A.    Slightly more, yes.

11:10:47 25     Q.    And what did that slightly more interaction

11:10:50 1   look like?

11:10:50 2       A.   That included more phone calls, video calls

11:10:54 3   between the kids, more frequent visitation whether it

11:10:58 4   was him coming to me or me coming to him.  He would

11:11:01 5   volunteer to take the kids overnight whether it be just

11:11:05 6   a single overnight or for an entire weekend.

11:11:08 7       Q.   Now let's talk about that.  How often or when

11:11:12 8   was the last time that you can recall Bruce spending an

11:11:18 9   overnight with the children?

11:11:20 10      A.   Last summer prior to my incarceration.

11:11:24 11      Q.   Was that the month of August or July?

11:11:28 12      A.   July.

11:11:29 13      Q.   And when were you incarcerated?

11:11:33 14      A.   August of '21.

11:11:34 15      Q.   Let's go back to right before you were

11:11:36 16  incarcerated.  [A.P.] and [R.H.], July, they had a

11:11:41 17  week -- or was that -- what was that timeframe, was it

11:11:44 18  a weekend or was it one overnight?

11:11:47 19      A.   Four -- well, four days, three nights.

11:11:51 20      Q.   Okay.  And is that an unusual amount of time

11:11:58 21  that he had with them?

11:11:59 22      A.   No.  And usually on those lengths of time on

11:12:03 23  the first day, I'll spend a majority of my time with

11:12:08 24  them and then release them to my dad for overnight.

11:12:11 25  And then he would be with them solo for the

| | |
|---|---|
| 11:12:15 1 | intermediate time and then we would have a collective |
| 11:12:16 2 | get-together on that final day. |
| 11:12:18 3 | Q.   Is that because this was the summertime, you |
| 11:12:22 4 | had spent more overnights with the children? |
| 11:12:23 5 | A.   Yes. |
| 11:12:24 6 | Q.   And during the school year, let's go back to |
| 11:12:28 7 | like the beginning of 2021 then.  During that |
| 11:12:33 8 | timeframe, during the school year, how often would you |
| 11:12:39 9 | either go to Bruce or Bruce would come to you to see |
| 11:12:42 10 | his grandchildren? |
| 11:12:43 11 | A.   At least once a month. |
| 11:12:45 12 | Q.   And what did you and the children do with |
| 11:12:55 13 | Bruce? |
| 11:12:55 14 | A.   We would go shopping, go to different parks, |
| 11:12:59 15 | go fishing, a lot of outdoor activities, go on short |
| 11:13:05 16 | hikes. |
| 11:13:06 17 | Q.   Did either child express any kind of fear or |
| 11:13:11 18 | displeasure of grandfather? |
| 11:13:14 19 | A.   Not that I personally ever seen. |
| 11:13:18 20 | Q.   Did they seem to have fun with grandfather? |
| 11:13:28 21 | A.   Yes. |
| 11:13:28 22 | Q.   Now given that you're incarcerated for a |
| 11:13:42 23 | lengthy period of time, what are you seeking as far as |
| 11:13:46 24 | any kind of custody? |
| 11:13:47 25 | A.   Obviously no physical custody, but I am |

11:13:52  1    seeking phone and video visitations.

11:13:56  2        Q.   Okay.  And can you tell me if you had a

11:14:03  3    discussion with the children prior to your

11:14:05  4    incarceration?  Did you tell them you were going to be

11:14:10  5    incarcerated or did you just disappear on them and not

11:14:14  6    let them know what was going on?

11:14:15  7        A.   Not specifically.  I did not tell them where

11:14:18  8    I was going, but I did say that I would not be around

11:14:20  9    for a while.

11:14:22 10        Q.   And?

11:14:23 11        A.   And that I would be trying to call them as

11:14:27 12    soon as I could.  I just didn't know when that time

11:14:30 13    would be.

11:14:30 14        Q.   Have you tried to call them?

11:14:32 15        A.   Yes.

11:14:33 16        Q.   And were you -- were you using a number that

11:14:37 17    was given to you at a custody conference in Lebanon?

11:14:40 18        A.   Yes.

11:14:41 19        Q.   Has that number worked?

11:14:43 20        A.   I have not been able to make contact through

11:14:46 21    the original number I received.

11:14:48 22        Q.   All right.  And did you recently learn of a

11:14:50 23    new number that was provided?

11:14:53 24        A.   I did.

11:14:54 25        Q.   When did you learn of that number?

11:14:56  1      A.   Roughly a week ago.

11:14:57  2      Q.   And did you -- were you able to use that

11:15:02  3  number and call again?

11:15:03  4      A.   Not at this point in time because the numbers

11:15:06  5  once they are added, they have to be added to an

11:15:08  6  approved list.

11:15:10  7      Q.   Did the children, [A.P.] and/or [R.H.], were

11:15:17  8  they -- did they want contact with you before you left?

11:15:22  9      A.   Yes.

11:15:22 10      Q.   Did [A.P.] or [R.H.] express the desire to

11:15:29 11  talk to you?

11:15:30 12      A.   Yes.

11:15:31 13      Q.   How so?

11:15:33 14      A.   When I had mentioned that I was going to be

11:15:37 15  unavailable, that I would still try to make contact

11:15:39 16  with them, [A.P.] asked me if the calls I would make

11:15:44 17  were through video.

11:15:45 18      Q.   Now you understand that [A.P.] was in

11:15:52 19  counseling prior?

11:15:53 20      A.   Yes.

11:15:53 21      Q.   Are you -- do you want [A.P.] and/or [R.H.]

11:16:00 22  in counseling now?

11:16:01 23      A.   I believe it would be beneficial, yes.

11:16:03 24      Q.   Why do you believe it would be beneficial?

11:16:05 25      A.   Because my children are going through a lot

11:16:09 1    of changes and a lot of thoughts have been running

11:16:15 2    through their heads. I can only imagine that them

11:16:19 3    being able to speak in confidence to somebody who is

11:16:21 4    not exactly an authoritative figure may be able to get

11:16:28 5    things straight with them.

11:16:29 6        Q.   Would you be okay if we started contact

11:16:33 7    through -- for [A.P.] that is, if the court order

11:16:38 8    contact through a therapeutic source? Would you be

11:16:43 9    okay with that?

11:16:44 10       A.   Yes.

11:16:44 11       Q.   Is that -- is that your ultimate desire?

11:16:47 12       A.   Ultimately, no. I would like to contact my

11:16:50 13   daughter without any type of mediation.

11:16:52 14       Q.   You would understand that given the time that

11:16:55 15   you have been unable to call her either through no

11:16:59 16   fault of your own or at your fault, you understand that

11:17:04 17   therapeutic counseling would be in her best interest to

11:17:06 18   foster the communication?

11:17:06 19       A.   Yes.

11:17:07 20       Q.   Both children you said were in counseling.

11:17:16 21   Do you remember the counselor's name or facility?

11:17:18 22       A.   Tom Snyder was his name. And he was a

11:17:22 23   referral through Lebanon County Children and Youth

11:17:24 24   Services.

11:17:24 25       Q.   Do these children have any kind of medical

```
11:17:32  1    issues that you're aware of?

11:17:37  2         A.   That I'm aware of, no.  When I left my

11:17:39  3    children, they were in good health.

11:17:41  4         Q.   Have you been -- has mother given you any

11:17:45  5    information regarding the children's medical updates

11:17:49  6    since your incarceration?

11:17:50  7         A.   None.

11:17:51  8         Q.   Has mother given you any information

11:17:53  9    regarding the children's school since you were

11:17:56 10    incarcerated?

11:17:57 11         A.   None.

11:17:58 12         Q.   Do you know if mother provided anything to

11:18:01 13    grandfather to give to you?

11:18:02 14         A.   To my knowledge, no.

11:18:04 15         Q.   Has mother tried to make contact with you

11:18:08 16    while you were incarcerated?

11:18:09 17         A.   No.

11:18:10 18         Q.   Do you have any other children, Kris?

11:18:20 19         A.   Yes, I do.

11:18:20 20         Q.   How many other children?

11:18:22 21         A.   One.

11:18:23 22         Q.   Where is that child at?

11:18:25 23         A.   Lebanon County.

11:18:26 24         Q.   And does your father see that child?

11:18:30 25         A.   Yes.
```

```
11:18:31  1          Q.    Is it your hope that Bruce would assist in

11:18:38  2    the sibling relationship between [R.H.] and [A.P.]?

11:18:43  3          A.    Yes.

11:18:43  4          Q.    Do you have any concerns about the way Bruce

11:18:51  5    is with your children?

11:18:52  6          A.    No, I don't.

11:18:55  7          Q.    Now, do you want your father to be involved

11:19:09  8    in this custody action through a court order?

11:19:12  9          A.    Yes.

11:19:22 10                       ATTORNEY HARSHBERGER:   The Court's

11:19:23 11    indulgence.

11:19:27 12                       THE COURT:   Sure.

11:19:27 13    BY ATTORNEY HARSHBERGER:

11:19:54 14          Q.    Who was the other child's mother?

11:19:56 15          A.    Taylor Fabio (phonetic).

11:20:00 16          Q.    Does Taylor and Bruce have a good

11:20:07 17    relationship?

11:20:07 18          A.    From my understanding, there have been no

11:20:10 19    issues.

11:20:11 20          Q.    From your understanding, how often does Bruce

11:20:15 21    talk with or see your other child?

11:20:18 22          A.    I cannot give an honest answer to that.

11:20:25 23                       THE COURT:   What is that child's name?

11:20:26 24                       THE WITNESS:   [A.H.], same last name as

11:20:28 25    me.
```

THE COURT:  How old is [A.H.]?

THE CHILD:  Two, Your Honor.

GRANDFATHER:  Just turned three.  Just had a birthday the other day.

THE COURT:  Thank you.  Go ahead, Attorney Harshberger.

ATTORNEY HARSHBERGER:  Thank you.

BY ATTORNEY HARSHBERGER:

Q.  I want to establish any kind of -- you said that when you were separated in 2021, Bruce would visit at least monthly and he did have some overnights during the summer especially, yes?

A.  Correct.

Q.  Now, in between that, did he call and talk to the children or Facebook call them or video chat with them?

A.  Yes.

Q.  How often do you believe that the children talked with Bruce?

A.  At least four times a week.

Q.  Okay.  Now, this is when you had them.  Do you know if Bruce ever talked to the children when the children were in custody of mom?

A.  I would have to say no.

Q.  And do you know if mom ever utilized Bruce as

11:21:37 1  a baby-sitter or someone to watch the children?

11:21:41 2      A.   No.

11:21:41 3      Q.   So when the children are with mom, the

11:21:44 4  children do not see Bruce?

11:21:48 5      A.   Correct.

11:21:48 6      Q.   But when the children were with you, you and

11:21:53 7  Bruce -- or Bruce would come over and see the children

11:21:56 8  and talk with them?

11:21:57 9      A.   That's correct.

11:21:58 10     Q.   Okay.

11:21:59 11          ATTORNEY HARSHBERGER:  I have no further

11:22:00 12 questions, Your Honor.

11:22:00 13          THE COURT:  Cross-examination.

11:22:02 14          ATTORNEY BODENE:  Thank you, Your Honor.

11:22:03 15                      *  *  *

11:22:03 16              CROSS-EXAMINATION

17  BY ATTORNEY BODENE:

11:22:04 18     Q.   Good morning, sir.  Just a couple of

11:22:06 19 clarifications first.  So the sentence you're serving

11:22:10 20 is for involuntary deviate sexual intercourse of a

11:22:14 21 14-year-old, correct?

11:22:14 22     A.   Yes.

11:22:15 23     Q.   And that was not just a one time event but it

11:22:18 24 was between the periods of November 4, 2019, and

11:22:21 25 January 26, 2020, that these events occurred, correct?

11:22:25  1    A.   Yes.

11:22:25  2    Q.   You were 37 at the time?

11:22:27  3    A.   Yes.

11:22:27  4    Q.   And you mentioned your parole date of

11:22:31  5  sometime in February 2026.  But your max date is August

11:22:36  6  of 2031, correct?

11:22:38  7    A.   If that's what the paperwork says, then yes.

11:22:41  8    Q.   And you're not guaranteed to be paroled on

11:22:44  9  your minimum date, correct?

11:22:45 10    A.   Nobody is.  That's correct.

11:22:46 11    Q.   In fact, you have programming that the prison

11:22:50 12  requires you to complete as part of your sentence,

11:22:54 13  correct?

11:22:54 14    A.   Correct.

11:22:54 15    Q.   And if you don't complete that programming,

11:22:57 16  you're not going to be released at a minimum until that

11:22:59 17  is completed, right?

11:23:00 18    A.   Correct.

11:23:01 19    Q.   And this occurred -- this IDSI, involuntary

11:23:10 20  deviate sexual intercourse, was itself a violation of

11:23:14 21  probation that you were already on, correct?

11:23:16 22    A.   Correct.

11:23:17 23    Q.   And that was for endangering the welfare of

11:23:21 24  the two children we are here to talk about today?

11:23:22 25    A.   That's correct.

11:23:23  1      Q.   So the contact that you indicated that you

11:23:32  2  tried to have -- let's first talk about since your

11:23:35  3  incarceration August 4th of last year.  How many --

11:23:39  4  what is the phone number that you tried calling Ms.

11:23:43  5  Pickett on, do you recall that?

11:23:44  6      A.   No, I don't have that information on me.

11:23:46  7      Q.   I mean you testified that you called it

11:23:49  8  repeatedly, right?

11:23:50  9      A.   Not on a regular basis.

11:23:53 10      Q.   Okay.  If I were to tell you that her number

11:23:56 11  is (717) 454-9566, does that sound right?

11:24:00 12      A.   I couldn't give you an honest answer.

11:24:05 13      Q.   Well, how many times did you -- since August

11:24:10 14  of last year since being incarcerated, how many times

11:24:13 15  did you place a phone call to the number that you

11:24:16 16  believed that she would be reachable at?

11:24:18 17      A.   One to two times a month because I was trying

11:24:20 18  on weekends.

11:24:21 19      Q.   So one to two times a month every month

11:24:26 20  beginning August until when?

11:24:28 21      A.   No.  It was not since August.  It was after

11:24:32 22  incarceration and arriving at SCI Phoenix in November.

11:24:37 23      Q.   Okay.  So November until when?

11:24:41 24      A.   Until roughly a week ago when I found out

11:24:45 25  that the 675 number was no longer valid.

11:24:49  1          Q.    Okay.  So your testimony is that from

11:24:53  2    November of 2021 until March of this year essentially,

11:24:57  3    you called one to two times a month?

11:24:59  4          A.    Correct.

11:24:59  5          Q.    And you had added that number to your

11:25:04  6    approved number list?

11:25:05  7          A.    Yes.

11:25:06  8          Q.    Would you call from your counselor's office

11:25:10  9    or from some other phone?

11:25:11 10          A.    From the only phone we have access to in the

11:25:14 11    day room.

11:25:14 12          Q.    Okay.  And how many voice mails did you

11:25:21 13    leave?

11:25:21 14          A.    None because they are not allowed.

11:25:23 15          Q.    By whom?

11:25:25 16          A.    The jail.

11:25:28 17                    THE GRANDFATHER:  The system.

11:25:29 18                    ATTORNEY BODENE:  You'll have a turn,

11:25:32 19    sir.

11:25:32 20    BY ATTORNEY BODENE:

11:25:33 21          Q.    So you didn't leave a single voice mail is

11:25:35 22    your testimony?

11:25:36 23          A.    Again, it is not allowable.  No.

11:25:38 24          Q.    What time -- what days of the week?  You said

11:25:40 25    you called on weekends?

11:25:41 1      A.    Usually on a Saturday.

11:25:42 2      Q.    At what time?

11:25:44 3      A.    It varied.  We had different blockout

11:25:49 4  schedules.

11:25:49 5      Q.    And how many times did -- would -- I'll

11:26:00 6  rephrase that.  Did you have e-mail access or do you

11:26:04 7  have e-mail access at the prison?

11:26:06 8      A.    I do not.  Not what anyone would commonly

11:26:09 9  consider e-mail.

11:26:10 10     Q.    Are you physically capable of sending an

11:26:13 11 e-mail?

11:26:13 12     A.    Only unless there is a person who approves

11:26:17 13 themselves as a contact for me to be able to send them

11:26:20 14 a digital message.

11:26:22 15     Q.    That's a request that you can put in?

11:26:24 16     A.    I would have to make contact with Ms. Pickett

11:26:27 17 first.

11:26:27 18     Q.    Okay.  And did you put in any sort of request

11:26:30 19 through your counselor, through your counselor at

11:26:34 20 prison, or your legal counsel to do that?

11:26:39 21     A.    I had sent a request for phone visitation

11:26:42 22 with my children through my counselor to which it was

11:26:46 23 not responded to.

11:26:47 24     Q.    Your prison counselor?

11:26:54 25     A.    Yes.

| | |
|---|---|
| 11:26:54 1 | Q. Do you have a copy of that request? |
| 11:26:55 2 | A. I do not. It should be on file through the |
| 11:27:00 3 | jail at least through the counselor, if not records. |
| 11:27:02 4 | Q. But you don't have that here today? |
| 11:27:03 5 | A. No. They don't give me a copy of it. |
| 11:27:06 6 | Q. So I'm going to -- your counsel, if he can be |
| 11:27:10 7 | so kind to show you Plaintiff's Exhibit 1, do you have |
| 11:27:13 8 | that? Do you have in front of you, sir, Plaintiff's |
| 11:27:25 9 | Exhibit 1? |
| 11:27:25 10 | A. I see it. |
| 11:27:28 11 | Q. Okay. That number at the top, (570) |
| 11:27:33 12 | 447-2751, that's your phone number before being |
| 11:27:35 13 | incarcerated, correct? |
| 11:27:36 14 | A. Correct. |
| 11:27:36 15 | Q. And this is a text message that you sent to |
| 11:27:39 16 | Ms. Pickett in December of 2020, correct? |
| 11:27:47 17 | ATTORNEY HARSHBERGER: I'm going to |
| 11:27:48 18 | object to relevancy. This is from 2020. He's |
| 11:27:50 19 | currently incarcerated. I'm not sure if he can be a |
| 11:27:52 20 | threat to or if this is -- make an allegation of a |
| 11:27:56 21 | threat while he's incarcerated. |
| 11:27:58 22 | ATTORNEY BODENE: It's not for the |
| 11:27:59 23 | content, Your Honor, and certainly not for having it go |
| 11:28:01 24 | to a threat. It is going to his testimony that he had |
| 11:28:04 25 | no idea how to reach her, her phone number has changed, |

| | |
|---|---|
| 11:28:07 1 | whatever.  This is him reaching her two years ago, |
| 11:28:10 2 | almost a year and a half ago. |
| 11:28:12 3 | THE COURT:  Overruled. |
| 11:28:13 4 | THE WITNESS:  Prior to incarceration. |
| 11:28:15 5 | BY ATTORNEY BODENE: |
| 11:28:17 6 | Q.  Sir, let me ask the question again.  I'm not |
| 11:28:19 7 | sure what you're answering.  This is the text that you |
| 11:28:20 8 | sent to her prior to incarceration, correct? |
| 11:28:22 9 | A.  Correct. |
| 11:28:23 10 | Q.  All right.  And would it surprise you to |
| 11:28:29 11 | learn that this is the 454-9566 number we talked about? |
| 11:28:32 12 | A.  It very well could be. |
| 11:28:34 13 | Q.  Okay.  If your counsel could kindly show you |
| 11:28:41 14 | Plaintiff's Exhibit 2.  Do you have that in front of |
| 11:28:50 15 | you now? |
| 11:28:51 16 | A.  Yes. |
| 11:28:52 17 | Q.  This e-mail, it is from |
| 11:29:04 18 | H-E-X-T-E-R-K-R-H-E-X, however you say that, at |
| 11:29:08 19 | gmail.com.  That was your e-mail before being |
| 11:29:09 20 | incarcerated, right? |
| 11:29:11 21 | A.  Correct. |
| 11:29:11 22 | Q.  And the e-mail is being sent to |
| 11:29:17 23 | S-A-R-A-D-O-E-S-T-H-E-T at gmail.com.  It was Ms. |
| 11:29:22 24 | Pickett's e-mail or is Ms. Pickett's e-mail? |
| 11:29:25 25 | A.  Yes. |

11:29:26 1      Q.   And this e-mail you sent to her back in May

11:29:29 2 of 2019?

11:29:29 3      A.   According to the timestamp, yes.

11:29:32 4      Q.   All right.  But this is an e-mail that you

11:29:34 5 sent to her, correct?

11:29:35 6      A.   Yes.

11:29:36 7           ATTORNEY BODENE:  All right.  And if

11:29:37 8 counsel could kindly show you Plaintiff's Exhibit 3.

11:29:42 9           ATTORNEY HARSHBERGER:  I'm going to

11:29:44 10 object as to hearsay.

11:29:46 11           THE COURT:  Be more specific, Attorney

11:29:50 12 Harshberger.

11:29:50 13           ATTORNEY HARSHBERGER:  It seems like it

11:29:51 14 is not related to either -- it is from someone else.

11:29:54 15 It is not a party.  I'm not sure.

11:29:59 16           ATTORNEY BODENE:  Your Honor, the -- I'd

11:30:01 17 be happy if the Court would like to redact the yellow

11:30:06 18 portions which are someone else.  The white portions

11:30:09 19 are Mr. Hexter who is here in court today.  It is not

11:30:12 20 being offered for the truth of what the other

11:30:14 21 individual and the conversation is stating.  That is

11:30:17 22 irrelevant.  It is going towards his communications and

11:30:21 23 he's here.

11:30:22 24           THE COURT:  Cross out the yellow, pay no

11:30:28 25 attention to it.

11:30:29  1        ATTORNEY HARSHBERGER:  I get the point
11:30:30  2  what he is trying to introduce for ability to contact.
11:30:34  3        THE COURT:  Okay.
11:30:35  4  BY ATTORNEY BODENE:
11:30:36  5     Q.   All right.  Sir, do you have in front of you
11:30:38  6  Plaintiff's Exhibit 3?
11:30:39  7     A.   I do.
11:30:39  8     Q.   Okay.  And that has the same number there at
11:30:42  9  the top, (570) 447-2751 and that being your phone
11:30:46 10  number, correct?
11:30:46 11     A.   My phone number, correct.
11:30:48 12     Q.   And Rusty, that is a name that you go by in
11:30:51 13  your e-mail and your text, right?
11:30:53 14     A.   Yes.
11:30:54 15     Q.   And, again, we are not going to get into what
11:30:59 16  the other individual in the text conversation is
11:31:02 17  saying.  But -- well, I'll let the exhibit speak for
11:31:07 18  itself.
11:31:08 19        All right.  So in one of the prior
11:31:17 20  orders since last year, it was indicated that you have
11:31:23 21  the right to contact your children by phone and I
11:31:27 22  believe it says something about sending mail to a PO
11:31:30 23  box.  Do you recall that?
11:31:31 24     A.   Yes.
11:31:31 25     Q.   Did you -- did you ever reach out to ask for

45

| | |
|---|---|
| 11:31:40 1 | a PO box to be set up or for what that PO box |
| 11:31:43 2 | information should be -- let me ask that better. |
| 11:31:47 3 | Did you ask Ms. Pickett since the date |
| 11:31:49 4 | of that order what her PO box information is? |
| 11:31:52 5 | A. I did not. |
| 11:31:53 6 | Q. Okay. When is the last time that you wrote |
| 11:31:56 7 | any letter to your kids? |
| 11:31:58 8 | A. It would have had to have been summer of 2020 |
| 11:32:06 9 | when I mailed a letter to my children through my |
| 11:32:09 10 | father, not through Ms. Pickett. |
| 11:32:11 11 | Q. Okay. All right. So talking about |
| 11:32:26 12 | contact -- let me hit something else first. I forgot |
| 11:32:29 13 | to mention on your criminal offense, you're also on |
| 11:32:34 14 | Megan's Law sex offender registration, correct? |
| 11:32:37 15 | A. Not until after completion of incarceration. |
| 11:32:39 16 | Q. That's fair. But you will be as a lifetime |
| 11:32:42 17 | registrant, correct? |
| 11:32:43 18 | A. From my understanding, yes. |
| 11:32:45 19 | Q. Has your sexually violent predator status |
| 11:32:48 20 | been determined yet? |
| 11:32:50 21 | A. I'm not sure what that -- what level you're |
| 11:32:55 22 | speaking of. |
| 11:32:55 23 | Q. So has your counsel talked to you about above |
| 11:33:00 24 | and beyond being a Megan's Law sexual offender, you |
| 11:33:04 25 | know, registrant on a website? There is an additional |

11:33:06  1  status called a sexually violent predator when you've
11:33:09  2  been convicted for this type of offense.  An evaluation
11:33:14  3  has to be done.  Has that been discussed with you at
11:33:15  4  all?
11:33:16  5          A.   Briefly.  And I was told that I will not be
11:33:18  6  on a predator's list -- violent predator's list.
11:33:23  7          Q.   Did you get something from the DA's Office or
11:33:25  8  the Court specifically saying that?
11:33:26  9          A.   It may be in my paperwork.  But I do not
11:33:29 10  physically have any possession of that.
11:33:30 11          Q.   Okay.  But you don't have that here today?
11:33:32 12          A.   Correct.
11:33:33 13          Q.   All right.  Talking about your father, also
11:33:42 14  Mr. Hexter, how would you like me to refer to him.
11:33:46 15  I'll call him your father.
11:33:49 16                  THE GRANDFATHER:  You can call me Bruce.
11:33:52 17                  ATTORNEY BODENE:  Is that all right?
11:33:54 18                  THE GRANDFATHER:  Yeah.
11:33:55 19  BY ATTORNEY BODENE:
11:33:56 20          Q.   So how often -- or does Bruce have
11:33:58 21  court-ordered time for your other child, [A.H.]?
11:34:02 22          A.   Not court ordered, no.  It is voluntary.
11:34:06 23          Q.   Okay.  Are you aware that [A.P.] has a heart
11:34:13 24  murmur?
11:34:13 25          A.   Under my care it was never confirmed.

Q.   Okay.

A.   From what I understand, it was [R.H.] who had the heart murmur, not [A.P.].

Q.   Just a minute ago you were asked if either of your kids had any medical issues and you said not that you know of.  That's correct, right, that was your testimony?

A.   It was never confirmed.  But yes, I did say that my kids were in good health.

ATTORNEY BODENE:  Your Honor, I have nothing further.

THE COURT:  I have a question, sir.  If this court ordered mother to send you information about the children's educational and medical needs and records and so forth, how would you want that to be sent to you?  How could you receive that if you don't have e-mail access?

THE WITNESS:  They can be sent through USPS, Your Honor.

THE COURT:  Regular mail?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Fair enough.  Redirect.

ATTORNEY HARSHBERGER:  Briefly, Your Honor.

* * *

REDIRECT EXAMINATION

BY ATTORNEY HARSHBERGER:

Q.   So it was asked did you ever write a letter since incarceration to mother.  Did mother, to the best of your knowledge, provide either her previous counsel, me, or anyone a PO box that she rented at her express -- at her expense as ordered at a summary report?

A.   No.

Q.   Did she ever disclose to you her actual address right now?

A.   No.  What I have on file is 2030 Coventry at Waterford.  And according to York police, they state that the address does not exist.

Q.   So you do not know mother's address.  So if you tried to write a letter, you could not write it and address to who it is addressed, correct?

A.   Correct.

Q.   And look at Exhibit 3.  That does not show any number who you texted.  So you have no idea who you texted according if you block out the yellow, there is no number up top that says who you texted?

A.   Correct or date.

Q.   Or date.  And number one, you have no idea

11:36:26 1    based upon this exhibit what that number was purported

11:36:31 2    to be that you were texting?

11:36:32 3        A.    Correct.

11:36:33 4        Q.    Okay.  Now to your understanding, has mother

11:36:37 5    changed her number -- has mother changed her number in

11:36:41 6    the past couple of years?

11:36:43 7        A.    Yes, multiple times.

11:36:44 8        Q.    How many numbers do you think that mother had

11:36:47 9    in the past couple of years, phone numbers?

11:36:50 10        A.    In the last three, I would say at least

11:36:53 11    three.

11:36:53 12        Q.    And how many -- well, that's three known to

11:36:56 13    you, right?

11:36:56 14        A.    Correct.

11:36:57 15        Q.    And how many addresses has mother lived at to

11:37:01 16    the best of your knowledge?

11:37:02 17        A.    I'm uncertain because I only have the one

11:37:04 18    address in York.

11:37:05 19        Q.    Okay.  Now, your understanding of the

11:37:10 20    communication system at SCI, can you get on a computer

11:37:14 21    and e-mail someone?

11:37:15 22        A.    No.

11:37:16 23        Q.    Do you need someone to call into the jail and

11:37:20 24    say put me on the list?

11:37:23 25        A.    Either call in or e-mail, yes, that's

11:37:25 1    correct.

11:37:25 2        Q.    So someone needs to proactively ask, I need

11:37:29 3    on Kris's list so I could e-mail him?

11:37:32 4        A.    Correct.

11:37:32 5        Q.    How does that then work?  Can you then just

11:37:36 6    e-mail or how does the digital communication as you

11:37:40 7    call it function?

11:37:41 8        A.    The person has to be approved first, and then

11:37:44 9    that person needs to buy credits so they can send and

11:37:48 10   receive e-mails from said inmate.  An inmate also needs

11:37:52 11   to have credits on his account in order to reply to any

11:37:57 12   e-mails.

11:37:57 13       Q.    So how do you see the digital communication?

11:38:01 14       A.    By logging into a kiosk in a public forum.

11:38:06 15       Q.    And then you can -- you can you print

11:38:09 16   anything?

11:38:09 17       A.    No, not at this time.

11:38:11 18       Q.    Could you view pictures?

11:38:13 19       A.    No.

11:38:13 20       Q.    Can you -- you could just read the digital

11:38:20 21   communication of what was written?

11:38:21 22       A.    Text only, no attachments.

11:38:23 23       Q.    What is your understanding of the SCI's

11:38:26 24   communication via telephone, so outbound calls?  When

11:38:33 25   you call, is it just ring on your end and someone picks

11:38:36  1    up?

11:38:36  2        A.    Yes.    Unless it is not picked up, it goes to

11:38:39  3    voice mail and then the system tells me that the call

11:38:43  4    may or may not have been received and/or answered.

11:38:46  5        Q.    Can you, in fact, leave a voice mail?

11:38:49  6        A.    I cannot.

11:38:52  7            ATTORNEY HARSHBERGER:    All right.    No

11:38:52  8    further questions on that.

11:38:53  9            THE COURT:    Recross.

11:38:55 10            ATTORNEY BODENE:    Thank you, Your Honor.

11:38:56 11                        *    *    *

11:38:56 12                    RECROSS-EXAMINATION

         13    BY ATTORNEY BODENE:

11:38:58 14        Q.    Just a quick point, sir.    If someone sends

11:39:00 15    you mail other than your attorney, that mail is not

11:39:03 16    private, correct?

11:39:05 17        A.    Correct.

11:39:06 18        Q.    In other words, it goes to an address in

11:39:08 19    Florida, gets scanned.    Various people will see it,

11:39:12 20    correct?

11:39:12 21        A.    Yes.

11:39:13 22        Q.    So if it is medical records having to do with

11:39:17 23    your children whose social security numbers, health

11:39:20 24    issues, things like that, that becomes public, correct,

11:39:22 25    by doing that?

11:39:23 1         A.    Yes.

11:39:25 2         Q.    Who is on your phone list currently?

11:39:32 3         A.    So far it is both my parents, Ms. Pickett,

11:39:35 4    and a few friends of mine.

11:39:36 5         Q.    So Ms. Pickett is on your phone list?

11:39:39 6         A.    Yes, with her old number.

11:39:44 7              ATTORNEY BODENE:   Nothing further, Your

11:39:45 8    Honor.

11:39:45 9              THE COURT:   Re-redirect?

11:39:47 10             ATTORNEY HARSHBERGER:   No.

11:39:48 11             THE COURT:   Okay.   All right.   Do you

11:39:52 12   have your next witness?

11:39:53 13             ATTORNEY HARSHBERGER:   I'll call Bruce

11:39:59 14   Hexter.

11:40:00 15             THE COURT:   Do you mind coming up here

11:40:01 16   to the witness stand, sir.   The clerk will swear you

11:40:06 17   in.

11:40:06 18                          *   *   *

        19                      BRUCE HEXTER,

        20                   called as a witness

        21          having been duly sworn according to law,

        22                   testified as follows:

11:40:36 23                          *   *   *

11:40:36 24             THE CLERK:   Please be seated.   Please

11:40:42 25   state and spell your first and last name.

```
11:40:45  1              THE WITNESS:  Bruce Hexter, B-r-u-c-e,
11:40:48  2      H-e-x-t-e-r.
11:40:51  3              THE COURT:  All right.  Attorney
11:40:53  4      Harshberger.
11:40:53  5              ATTORNEY HARSHBERGER:  Thank you.
          6                      *   *   *
          7              DIRECT EXAMINATION
          8      BY ATTORNEY HARSHBERGER:
          9          Q.  Bruce, is it all right if I call you Bruce?
         10          A.  Yep.
11:40:56 11          Q.  Bruce, how old are you today?
11:40:58 12          A.  I'm 70.
11:40:59 13          Q.  Okay.  And what do you do for a living,
         14      Bruce?
11:41:02 15          A.  I'm retired.
11:41:02 16          Q.  So you're able to, if need be, visit your
11:41:07 17      grandchildren as often as you would love?
11:41:09 18          A.  Yes.
11:41:10 19          Q.  Okay.  And what are you asking the Court for
11:41:14 20      as far as visits?
11:41:14 21          A.  I'd like to have the children at least for a
11:41:19 22      full weekend maybe once a month or every other month.
11:41:23 23          Q.  Okay.  So you're willing to do something as
11:41:27 24      far as a weekend?
11:41:27 25          A.  Plus a week.  Maybe a week a year for
```

11:41:30  1    vacation, to take them to the shore or something like

11:41:32  2    that.

11:41:33  3        Q.    Have you ever taken the children to the

11:41:34  4    shore?

11:41:35  5        A.    I haven't taken them to the shore, but I've

11:41:37  6    taken them to different -- a lot of different parks to

11:41:40  7    play.

11:41:40  8        Q.    Where have you taken them to?

11:41:42  9        A.    A lot of different playgrounds in the area

11:41:45 10    that I've taken them to and my -- down where I live.

11:41:49 11    Down with some friends at my friend's house, they have

11:41:53 12    a giant playground that is actually called the castle

11:41:56 13    and looks like one.

11:41:58 14        Q.    Where do you live, Mr. Bruce?

11:42:00 15        A.    I live in Sanatoga, Pennsylvania.

11:42:03 16        Q.    And how far away is that a drive?

11:42:06 17        A.    From here?

11:42:07 18        Q.    From here, yeah.

11:42:08 19        A.    From here, it took me approximately an hour

11:42:11 20    and 45 minutes -- between an hour and 45 minutes to two

11:42:15 21    hours to get here this morning.

11:42:17 22        Q.    We had a little weather this morning, right,

11:42:18 23    that played a factor in the travel time?

11:42:20 24        A.    Believe it or not, it didn't.  I stayed right

11:42:22 25    to the speed limit, didn't have to slow down.

11:42:24  1          Q.    Did you -- other things you do with -- well,

11:42:29  2    let's talk about this.  When did you first meet [A.P.]?

11:42:31  3          A.    When she was born.

11:42:34  4          Q.    And when did you first meet [R.H.]?

11:42:37  5          A.    The day he was actually born.

11:42:39  6          Q.    Now, you understand that [A.P.] is not your

11:42:49  7    biological grandchild?

11:42:51  8          A.    Correct.

11:42:52  9          Q.    Okay.  And [R.H.] is your biological

11:42:58 10    grandchild?

11:42:59 11          A.    Yes.

11:42:59 12          Q.    And [A.H.] is a half sibling of these two and

11:43:03 13    she is a biological grandchild?

11:43:05 14          A.    Yes.

11:43:05 15          Q.    Has [A.P.] and [R.H.] met [A.H.]?

11:43:13 16          A.    Yes, they did.

11:43:14 17          Q.    And were you present when they met [A.H.]?

11:43:18 18          A.    I wasn't there the day that they met.  But it

11:43:28 19    could've been a couple days or week before I was there

11:43:32 20    for them.

11:43:33 21          Q.    Did you see the interaction between [A.P.],

11:43:36 22    [R.H.], and [A.H.]?

11:43:37 23          A.    Yes.  They used to hold her, feed her.  Feed

11:43:46 24    her the bottle and everything.

11:43:48 25                    THE COURT:  When is this?  When are we

talking about?

THE WITNESS:  Well, [A.H.] just turned three.  So when she was a newborn they were feeding her and everything.

THE COURT:  We're talking about a couple years ago?

THE WITNESS:  Three years ago.

THE COURT:  Okay.

THE WITNESS:  All of way up until the separation of Kris and Taylor.

THE COURT:  Okay.  All right.  Go ahead.

BY ATTORNEY HARSHBERGER:

Q.  So then as recently as 2021, has the children -- all three children been together?

A.  I would say yes.

Q.  Okay.  And you were able to see those relationships between the children grow from newborn to one to two and, well, you can't say three?

A.  Well, yeah.  Probably it was what, about a year and a half when they separated I believe.  When Kris and Taylor separated and left with [A.H.].

Q.  And right now, how often do you get to see [A.H.]?

A.  Past couple months I've seen her a couple of times.

11:44:55  1      Q.   Would you like to bring [R.H.] and [A.P.]

11:44:58  2  around [A.H.] again?

11:45:00  3      A.   Yes.  Because Taylor, the mother, [A.H.]'s

11:45:06  4  mother has said -- asked me -- constantly asked me have

11:45:09  5  I seen or heard anything from the two kids because she

11:45:14  6  even liked the kids and got along with them great.

11:45:16  7      Q.   Now, at your house, did you do any fun things

11:45:21  8  with [A.P.] and [R.H.]?

11:45:23  9      A.   Played games, took them -- I have bicycles at

11:45:28 10  my house.  I bring them down from Kris's house or he

11:45:32 11  would bring them down and have them out riding bikes

11:45:37 12  all around in my neighborhood and taking them different

11:45:42 13  places --

11:45:44 14      Q.   Now --

11:45:45 15      A.   -- playing games.

11:45:46 16      Q.   You said that you take them fishing, right?

11:45:49 17      A.   Yes, I have taken them fishing.

11:45:52 18      Q.   What do you fish for?

11:45:53 19      A.   Go out trout fishing.  I'm a member of a club

11:45:57 20  called Stony Creek Anglers.  They actually had a trout

11:46:02 21  tournament that Kris actually brought them down to, and

11:46:06 22  the kids did their own fishing right there.  We helped

11:46:10 23  them out, took them to other -- I took them up to a

11:46:13 24  place by Kris's house to go fishing.

11:46:16 25      Q.   How old were they when you did that, can you

11:46:19 1    remember?  How long ago was that?  Better question.

11:46:26 2        A.    I guess they were three and four and five,

11:46:31 3    six.

11:46:31 4        Q.    Have you taken them fishing every year?

11:46:33 5        A.    I've taken them a couple of times, couple

11:46:35 6    years different times.

11:46:37 7        Q.    Do they know how --

11:46:39 8        A.    I actually bought their own rods for them.

11:46:43 9        Q.    Do they know how to bait their own hook right

11:46:46 10   now?

11:46:46 11       A.    Oh, no.  That's a little rough especially

11:46:49 12   with the baits that I use.

11:46:50 13       Q.    So what do they call you?  What does [R.H.]

11:46:54 14   call you?

11:46:55 15       A.    Both call me Pop Pop.

11:46:56 16       Q.    And so I guess Pop Pop baits the hook.  Do

11:47:00 17   they throw it out?

11:47:01 18       A.    No.  I cast out for them because the rods are

11:47:05 19   a little bit rough to try to use.  Push buttons, they

11:47:09 20   can't get the hang of it yet.

11:47:12 21       Q.    Can they reel it in?

11:47:14 22       A.    Oh, yeah.

11:47:14 23       Q.    Have each one of them caught at least one

11:47:16 24   fish in their life?

11:47:18 25       A.    Yes.

1          Q.    Bike --

11:47:21  2          A.    I did have pictures but I can't find them of

11:47:23  3    the fish that they caught at our trout rodeos.

11:47:27  4          Q.    I apologize.  I'm trying to not talk when he

11:47:30  5    does.  And bike riding, you have them bike ride at your

11:47:38  6    house?

11:47:39  7          A.    Yes.

11:47:39  8          Q.    Did you buy them bicycles?

11:47:42  9          A.    Yes, I bought them both bicycles for their --

11:47:46 10    for either birthday or Christmas presents.

11:47:48 11          Q.    And do those bikes stay at your house or do

11:47:51 12    they go to Kris's or come and go?

11:47:53 13          A.    They were at Kris's house until he got

11:47:58 14    incarcerated.  Then I brought them back down to my

11:48:00 15    house which, of course, they have been sitting there

11:48:02 16    since.  But they would travel back and forth when they

11:48:06 17    were coming or going.

11:48:07 18          Q.    And you provided some pictures today,

11:48:13 19    collectively they are Exhibit No. 1 of bicycle and the

11:48:16 20    fishing and going to -- you took them to see Santa?

11:48:20 21          A.    Yeah.

11:48:20 22          Q.    Okay.  And those pictures, you took those

11:48:23 23    pictures?

11:48:23 24          A.    Yes, I did.

11:48:24 25          Q.    Those are an actual representation of what

11:48:28 1    was occurring that day?

11:48:29 2        A.    Yes.

11:48:29 3        Q.    And the picture is with both [A.P.] and

11:48:36 4    [R.H.]?

11:48:36 5        A.    Yes.

11:48:36 6        Q.    They seem happy in those photos?

11:48:41 7        A.    They are very happy.  They had a blast.

11:48:43 8        Q.    Now, you being -- and I mean no disrespect

11:48:48 9    with this comment.  You being 70, you have pictures

11:48:53 10   from 2019.  Do you have any pictures newer?

11:48:56 11       A.    I think there is one or two pictures there of

11:48:59 12   2020.  I'm not much of a picture taker as you can

11:49:02 13   probably tell.

11:49:05 14            THE COURT:  As a grandfather of seven, I

11:49:08 15   will tell you you might want to improve on that a

11:49:10 16   little bit.

11:49:11 17            THE WITNESS:  You take a lot of

11:49:12 18   pictures?

11:49:13 19            THE COURT:  I do and I airdrop them to

11:49:15 20   various people.

11:49:16 21            THE WITNESS:  I'm very -- I don't take

11:49:18 22   many pictures at all to be honest with you.

11:49:20 23            THE COURT:  I understand.  I was just

11:49:23 24   trying to persuade you.  You might want to reconsider

11:49:24 25   that.

11:49:24  1                    THE WITNESS: Yep.  All right.  Go

11:49:26  2    ahead.

11:49:27  3    BY ATTORNEY HARSHBERGER:

11:49:27  4        Q.    Given that you have limited time -- I mean

11:49:30  5    let me retract that question.  During -- before Kris

11:49:35  6    was incarcerated, you had time to spend with the

11:49:42  7    children on weekends and overnights, correct?

11:49:48  8        A.    Yes.

11:49:48  9        Q.    So let's go back to --

11:49:50 10        A.    Various.

11:49:51 11        Q.    -- 2021.  You had some overnights.  How many

11:49:57 12    overnights do you think that you had until August

11:49:59 13    whenever Kris was incarcerated?

11:50:01 14        A.    Probably a good half dozen or more.

11:50:06 15        Q.    How many visits do you think that you had

11:50:08 16    during that period of time?

11:50:09 17        A.    Just -- just like day visits?

11:50:12 18        Q.    Yeah.  In addition to the overnights.

11:50:14 19        A.    Oh, probably once a month.  I mean at least

11:50:17 20    once a month.

11:50:18 21        Q.    Were you calling them on the phone?

11:50:20 22        A.    Constantly.

11:50:22 23        Q.    Now --

11:50:23 24        A.    Three or four times a week.  Video chatting

11:50:28 25    them.

11:50:28 1    Q.    I mean no disrespect by this.    But how were

11:50:30 2    you actually video chatting them?

11:50:32 3    A.    On my cell phone.

11:50:35 4    Q.    Through --

11:50:36 5    A.    I talk to them through Facebook messenger.

11:50:39 6    They have this spot that you can open up and talk to

11:50:43 7    them.

11:50:43 8                THE COURT:  I'm impressed.

11:50:45 9                THE WITNESS:  He taught me how to do it.

11:50:47 10               THE COURT:  I understand completely.

11:50:49 11               THE WITNESS:  I'm not a computer person.

11:50:51 12   BY ATTORNEY HARSHBERGER:

11:50:51 13   Q.    So you were able to do that with Kris, right?

11:50:53 14   A.    Yes.

11:50:54 15   Q.    Now, were you at one point in time able to

11:50:57 16   communicate with mother and call the children on either

11:51:01 17   her Facebook account or do the children have Facebook

11:51:04 18   accounts?

11:51:04 19   A.    Yes, I did.  Every once in while I talk to

11:51:08 20   mother with the kids on Facebook -- face chat or

11:51:11 21   whatever you want to call it through messenger.  And

11:51:14 22   then all of a sudden got cut off.

11:51:18 23   Q.    Do you have an estimated time when that was?

11:51:22 24   A.    No, I don't.  I can't remember off the top of

11:51:26 25   my head.  I'm sorry.

11:51:27 1    Q.    Now since Kris was incarcerated, have you

11:51:33 2    seen [R.H.] or [A.P.] at all?

11:51:36 3    A.    Not at all, not once.

11:51:39 4    Q.    Can you call mom on Facebook messenger like

11:51:43 5    you were doing previously?

11:51:44 6    A.    No.  Because she cut me off.  She blocked me.

11:51:49 7    Q.    Okay.  Do you feel at this time comfortable

11:51:56 8    calling mom on the phone?

11:51:57 9    A.    If I could call and talk -- and talk to her

11:52:01 10   and get the kids and talk with the kids and everything,

11:52:04 11   yes.

11:52:04 12   Q.    So the question is going to be raised, why

11:52:07 13   have you not called them since August then?

11:52:10 14   A.    The number --

11:52:12 15   Q.    Why had you not called mom since August?

11:52:13 16   A.    The number that I had was the incorrect

11:52:16 17   number.

11:52:17 18   Q.    And did you somehow make someone aware of

11:52:20 19   that?

11:52:21 20   A.    I notified -- I told you about it, and then

11:52:24 21   you gave me the new number that you had gotten.

11:52:26 22   Q.    And --

11:52:27 23   A.    That was just recently.

11:52:28 24   Q.    Right.  And have you tried that number?

11:52:31 25   A.    No, I hadn't tried it yet.  I said, okay.  We

64

| | |
|---|---|
| 11:52:35 1 | are at the point right now close to trial, I'll just |
| 11:52:37 2 | wait until trial -- |
| 11:52:38 3 | Q.    Okay. |
| 11:52:41 4 | A.    -- or hearing, whatever you want to call it. |
| 11:52:43 5 | Q.    Do you love your grandchildren, [A.P.] and |
| 11:52:47 6 | [R.H.]? |
| 11:52:47 7 | A.    Definitely. |
| 11:52:49 8 | Q.    Are you at some points in times stern with |
| 11:52:54 9 | them? |
| 11:52:54 10 | A.    I've been stern with them, yes. |
| 11:52:56 11 | Q.    Is that when maybe they are putting |
| 11:53:00 12 | themselves in danger that you need to correct them? |
| 11:53:03 13 | ATTORNEY BODENE:  Objection, leading. |
| 11:53:04 14 | THE WITNESS:  Pardon. |
| 11:53:04 15 | THE COURT:  It is leading but overruled. |
| 11:53:10 16 | Go ahead.  You may answer. |
| 11:53:11 17 | THE WITNESS:  I've been stern with them |
| 11:53:13 18 | when trying to correct them if I see them doing |
| 11:53:16 19 | something wrong or incorrectly or something that might |
| 11:53:19 20 | harm them.  Then I would be very stern with them. |
| 11:53:22 21 | BY ATTORNEY HARSHBERGER: |
| 11:53:23 22 | Q.    Okay. |
| 11:53:28 23 | A.    By raising my voice. |
| 11:53:29 24 | Q.    Do you know mother's address? |
| 11:53:39 25 | A.    I heard once.  I forgot to write it down and |

11:53:44  1    don't have it offhand.  I know it's something with two

11:53:48  2    names in the address and then York.

11:53:50  3         Q.   So you don't have a good address to mail the

11:53:53  4    children gifts or letters or anything?

11:53:55  5         A.   I don't.  I don't have it at the present.

11:53:58  6         Q.   Okay.  What -- well, I guess we asked.  What

11:54:06  7    are you -- what else would you like to tell mom today

11:54:10  8    or the Court today?

11:54:13  9         A.   I'd like to see my grandchildren.  I love

11:54:15 10    those kids dearly, and I'd like to be able to spend

11:54:20 11    time with them.  And I think the kids love me.  That's

11:54:25 12    my opinion.  They used to -- when they would come over

11:54:29 13    to my house, they would basically fight as to who was

11:54:32 14    going to sit on grand pop's lap while we sat there and

11:54:37 15    watched a movie.

11:54:38 16         Q.   And I guess if you were granted weekends

11:54:41 17    without Kris there or some period of time, what would

11:54:45 18    you plan on doing?  Would you want to meet halfway,

11:54:49 19    want to travel all of the way to York, would you want

11:54:53 20    her to travel to you?  What would you like?

11:54:55 21         A.   If we can get set up where I travel once to

11:54:59 22    pick up and she comes to me to pick them back up or

11:55:04 23    vice versa, reverse each time or meet halfway if we

11:55:11 24    have to.

11:55:12 25         Q.   If you met sometimes, you would be okay with

11:55:17 1    coming and picking them up because you would have

11:55:19 2    something planned in this area?

11:55:20 3         A.    Yes.    I would do it that way if I had to if I

11:55:27 4    could find something.    I don't -- I'll be honest with

11:55:30 5    you.    I don't know this area at all.    I know my area

11:55:35 6    very well to be able to take the kids and do stuff down

11:55:39 7    in my area.

11:55:40 8         Q.    Assuming that the weather is bad outside and

11:55:44 9    you can't go outside and do things outside, what would

11:55:46 10   you do in your house with the children for a weekend?

11:55:50 11        A.    I might take them to a movie for the day --

11:55:52 12   or during the day or something and then come home and

11:55:55 13   maybe play games, get them to color, put puzzles

11:56:03 14   together with them.

11:56:05 15        Q.    Have you done that in the past, put puzzles

11:56:08 16   together with them?

11:56:09 17        A.    Pardon.

11:56:09 18        Q.    Have you done that in the past, put puzzles

11:56:12 19   together?

11:56:12 20        A.    At the time, they were a little bit young and

11:56:15 21   we did some of the small puzzles that took two minutes

11:56:18 22   to do that type of puzzle.    Now that they are getting

11:56:21 23   older, probably get into more intricate puzzles I would

11:56:27 24   get.

11:56:27 25             ATTORNEY HARSHBERGER:    I don't have

anything else.

THE COURT:  Cross-examination.

ATTORNEY BODENE:  Thank you, sir.

*  *  *

CROSS-EXAMINATION

BY ATTORNEY BODENE:

Q.   Sir, you have been in the courtroom this entire proceeding, right?

A.   Correct.

Q.   So you were there when your counsel indicated at the beginning when we were kind of doing housekeeping issues, he indicated something to the effect that you were looking to foster communication between your son and the kids.  Do you remember when he said that?

A.   Yes.

Q.   Can you understand how that might be slightly concerning for mom's perspective given dad's situation?

A.   Correct.

Q.   You and mom did have a period where you were able to -- where you were able to communicate. Specifically, your son was previously incarcerated I believe from May to September of 2020.  Does that sound right?

A.   Correct.

11:57:23  1      Q.   During that time, you reached out to her and

11:57:27  2  the two of you were able to make some informal

11:57:30  3  arrangements, correct?

11:57:31  4      A.   Correct.  We were talking back and forth on

11:57:33  5  the Facebook chats.

11:57:35  6      Q.   And so can you understand how coming to court

11:57:40  7  and seeking a court order mandate that essentially

11:57:45  8  doesn't need or ask for her permission might have a

11:57:49  9  chilling effect on that relationship?

11:57:51 10      A.   Yeah.

11:57:51 11      Q.   So --

11:58:01 12           ATTORNEY HARSHBERGER:  I'm sorry.  Was

11:58:03 13  that question finished?

11:58:03 14           ATTORNEY BODENE:  I was done.  He said

11:58:05 15  yes.

11:58:05 16           ATTORNEY HARSHBERGER:  Okay.

11:58:06 17  BY ATTORNEY BODENE:

11:58:11 18      Q.   Sir, the phone number, do you remember off

11:58:14 19  the top of your head the phone number that she has?

11:58:17 20      A.   I look at names on my phone and push the

11:58:19 21  button.

11:58:20 22      Q.   I understand.

11:58:21 23      A.   That's what today's technology is.

11:58:24 24      Q.   I understand.  I guess the number that I

11:58:31 25  indicated when I was asking your son questions, did

11:58:34 1    that sound correct to you?  Do you have any reason to

11:58:37 2    believe that is not her number?

11:58:38 3        A.    It could be.  Like I said, I don't remember

11:58:43 4    numbers.

11:58:43 5        Q.    Okay.  That's fair.

11:58:46 6        A.    I even have to look up my own once in a

11:58:48 7    while.

11:58:49 8        Q.    Do you remember when the last time you

11:58:50 9    changed her phone number in your phone was?

11:58:53 10       A.    Just the other day when I got the new number

11:58:56 11   off of Josh.  I put that new number in.  I don't know

11:59:01 12   what that number is.  I just added it to her phone.

11:59:06 13       Q.    Have you ever e-mailed with her before?

11:59:09 14       A.    No.

11:59:09 15       Q.    But I guess let me ask it this way.  You

11:59:17 16   don't have any reason to question if I say she's had

11:59:21 17   her current phone number since late 2020.  You don't

11:59:25 18   have any specific information to say that is wrong,

11:59:28 19   correct?

11:59:28 20       A.    I don't have -- I can't say yes or no to

11:59:31 21   that.

11:59:31 22       Q.    And then if -- the same thing with her

11:59:34 23   e-mail.  If the e-mail that I said into the record

11:59:37 24   earlier for Ms. Pickett, if I were to say that she had

11:59:43 25   that for the last several years, you don't have --

11:59:45 1     A.   I never e-mailed her.  So I have no idea what

11:59:47 2  her --

11:59:48 3     Q.   Okay.  So you haven't reached out -- when is

11:59:58 4  the last time that you did call Ms. Pickett?

12:00:01 5     A.   Actually talk to her on the phone?

12:00:05 6     Q.   Or even attempted to call her.

12:00:07 7     A.   I think I attempted once or twice prior to or

12:00:14 8  after his incarceration and got no answer.

12:00:17 9     Q.   Did you leave a voice mail?

12:00:18 10     A.   It just wouldn't even let me leave a voice

12:00:23 11  mail.

12:00:24 12     Q.   Sir, you indicated you're retired, and I

12:00:29 13  understand that doesn't mean you have nothing to do.

12:00:32 14  You're probably busier now than you were working.

12:00:35 15     A.   Oh, yeah.

12:00:36 16     Q.   Would you -- if the Court gives you some, you

12:00:41 17  know, time for the kids, would you be willing,

12:00:46 18  understanding that mom is employed, would you be

12:00:49 19  willing to do more than half of the transportation?  Is

12:00:53 20  that something you would be willing to consider?

12:00:54 21     A.   I would consider that, yes.

12:00:57 22     Q.   And if the Court arranged for a certain

12:01:08 23  amount of time say per month, would you be flexible on

12:01:14 24  that to accommodate like if mom has prior plans or if

12:01:17 25  you have prior plans that you guys are able to --

12:01:20  1     A.   Yes.

12:01:22  2     Q.   -- be flexible?

12:01:22  3     A.   I would be very flexible with that.  And also

12:01:25  4  weather, depending on weather would be flexible -- both

12:01:29  5  of us be flexible due to weather because of the

12:01:31  6  distance that I have to travel to come down or she

12:01:35  7  would have to travel to come up, either way.

12:01:42  8          ATTORNEY BODENE:  Thank you, sir.  No

12:01:43  9  further questions.

12:01:43 10          THE COURT:  Redirect.

         11          ATTORNEY HARSHBERGER:  Briefly.  I

12:01:47 12  apologize for not asking this earlier.

12:01:48 13             *   *   *

12:01:48 14          REDIRECT EXAMINATION

         15  BY ATTORNEY HARSHBERGER:

12:01:50 16     Q.   Do you get calls from Kris from SCI?

12:01:53 17     A.   Yes, I do.

12:01:53 18     Q.   Explain that process.  What happens when you

12:01:56 19  pick the phone up?

12:01:57 20     A.   I answer the phone.  It says you have a call

12:02:01 21  coming from and you hear him saying Kris.  To accept --

12:02:08 22  or it says something to the effect if you think this

12:02:11 23  call is incorrect, hang up and do something.  I can't

12:02:15 24  remember what the exact wording is.  But press one to

12:02:18 25  accept the call.

12:02:20  1      Q.    Okay.

12:02:20  2      A.    When I do that, then he comes on.  I start

12:02:23  3  talking to him.

12:02:24  4      Q.    All right.  So --

12:02:25  5      A.    We get interrupted twice during the call

12:02:28  6  saying it is being recorded.

12:02:30  7      Q.    So my understanding is from what you're

12:02:32  8  telling me is you have to hit one in order to be

12:02:34  9  connected?

12:02:35 10      A.    I have to hit one on my phone to be connected

12:02:38 11  so I can talk to him.  So he can -- if he is trying to

12:02:44 12  leave me a voice mail, he can't because I didn't hit

12:02:47 13  one.

12:02:48 14      Q.    Now, when you called the number that you

12:02:56 15  thought was Ms. Pickett's --

12:02:59 16      A.    Yes.

12:03:00 17      Q.    -- that number just rang and rang and rang

12:03:03 18  and no one ever answered, no voice mail ever picked up?

12:03:05 19      A.    Correct.

12:03:05 20      Q.    You previously were able to communicate with

12:03:08 21  her on Facebook and that has since been stopped and

12:03:12 22  blocked?

12:03:12 23      A.    Correct.

12:03:13 24      Q.    Did you block her?

12:03:14 25      A.    I did not block her.

```
12:03:16  1        Q.    So you still want to try to call her on
12:03:19  2    Facebook messenger?
12:03:20  3        A.    Yeah.  I wanted to call and talk to the grand
12:03:24  4    kids.  So I can Facebook talk to the kids on, hey, how
12:03:27  5    are you doing?  Oh, look what you're doing now.
12:03:29  6        Q.    And how often would you like to do that?
12:03:32  7        A.    Maybe once a week.
12:03:35  8        Q.    We're not talking long.  I mean how long
12:03:37  9    would you want -- how long were you on the phone with
12:03:39 10    them previously?
12:03:40 11        A.    Sometimes I get on the phone with them like
12:03:42 12    that for over half hour.  And then they start clowning
12:03:46 13    around and I said, okay, we got to go now.  I'd hang up
12:03:51 14    on them because they were starting to get rowdy.
         15              ATTORNEY HARSHBERGER:  All right.  I
12:03:57 16    have no further questions.
12:03:58 17              ATTORNEY BODENE:  No recross, Your
12:03:59 18    Honor.
12:03:59 19              THE COURT:  All right.  You may stand
12:04:01 20    down.  Thank you.  Attorney Harshberger, any other
12:04:04 21    witnesses?
12:04:05 22              ATTORNEY HARSHBERGER:  I do not, Your
12:04:06 23    Honor.
12:04:06 24              THE COURT:  I would try to finish this
12:04:09 25    today but I've got a 1:00 and 1:30 that is going to
```

12:04:14  1  prohibit that.  So we are going to have to come back

12:04:16  2  and finish yet.

12:04:22  3          Attorney Bodene, do you want to give me

12:04:26  4  how long that will take?

12:04:28  5          ATTORNEY BODENE:  I have one witness,

12:04:29  6  Your Honor.  Likely maybe an hour I would imagine.

12:04:31  7  Before I forget, Your Honor, I would move to admit my

12:04:33  8  Exhibits 1 through 3 with the redaction of the yellow

12:04:36  9  portions of Exhibit 3.

12:04:38 10          THE COURT:  Any objection?

12:04:38 11          ATTORNEY HARSHBERGER:  No objection.

12:04:39 12          THE COURT:  You're asking for the

12:04:40 13  admission of yours also?

12:04:42 14          ATTORNEY HARSHBERGER:  Yes.

12:04:42 15          ATTORNEY BODENE:  No objection.

12:04:46 16          THE COURT:  They are all admitted.  I'm

12:04:49 17  giving them to the Prothonotary right now.  Get your

12:04:56 18  calendars out.  We are going to go off the record.

12:05:15 19  Father or grandfather can participate by either Zoom or

12:05:17 20  video.  That's fine.

12:05:19 21          (A discussion was held off the record.)

12:06:06 22          THE COURT:  June 2nd at 1:30 works.

12:06:10 23  Okay.

12:06:20 24          In this matter, this custody trial needs

12:06:25 25  completed.  Mother has to put on her case, and the

12:06:29  1    Court has been advised that should take an hour to an

12:06:32  2    hour-and-a-half.

12:06:32  3             Accordingly, the Court does schedule

12:06:34  4    this to be finished on June 2, 2022, at 1:30 p.m.  The

12:06:42  5    Court has allowed one-and-a-half hours to finish this.

12:06:45  6    Father and/or grandfather may participate by Zoom

12:06:49  7    rather than live if they so prefer.

12:06:53  8             In the meantime, the Court issues the

12:06:55  9    following temporary order:

12:06:56 10             First of all, for both of these

12:07:01 11    children, [R.H.] and [A.P.], mother has sole legal and

12:07:05 12    sole physical custody.  However, for both children,

12:07:13 13    mother will furnish to father all educational, medical,

12:07:22 14    counseling, and all other records to father within

12:07:29 15    48 hours of her receiving them by her putting them in

12:07:31 16    the United States mail postage prepaid within 48 hours

12:07:35 17    of her receiving them; and, hopefully, father will

12:07:38 18    receive them somewhat shortly thereafter.

12:07:42 19             The Court is cognizant that the United

12:07:44 20    States mail takes a long time these days.  But father

12:07:47 21    doesn't seem to have any other way of receiving these

12:07:50 22    things.  So for now, mother will send them to father

12:07:54 23    through the United States mail.

12:07:57 24             Additionally, father may have phone

12:08:00 25    contact with [R.H.] only for up to 30 minutes one time

12:08:06  1    per week, and it can be by Zoom or other video.  The

12:08:13  2    times will be agreed to by the parties.

12:08:16  3              Additionally, father may write letters

12:08:18  4    to [R.H.] through mother.  Father is to have no contact

12:08:24  5    with [A.P.] until further order of court.

12:08:26  6              Grandfather, also known as Pop Pop, will

12:08:32  7    have partial physical custody of both children one time

12:08:37  8    per month for nine hours.  That will be on a Saturday

12:08:43  9    from 10 a.m. until 7 p.m.  The first Saturday will be

12:08:47 10    this coming Saturday, April 9, 2022, and the second

12:08:53 11    Saturday of each month thereafter.  Pop Pop, Mr. Bruce

12:09:01 12    Hexter, will pick up the children at mother's residence

12:09:05 13    and then mother will pick up the children at

12:09:09 14    grandfather's residence at the conclusion of the nine

12:09:12 15    hour time period.

12:09:17 16              Additionally, the grandfather, also

12:09:19 17    known as Pop Pop, may have phone or video times with

12:09:28 18    these two children as he may arrange with mother; but

12:09:35 19    they should be at least three times per month.

12:09:41 20              Finally, mother is ordered to contact a

12:09:43 21    therapist of her choice and try to commence some

12:09:48 22    therapy for [A.P.] to at the very least deal with her

12:09:53 23    issues relative to her biological father or

12:09:57 24    psychological father, which she refers to as her

12:10:01 25    brother's father, the interplay of that issue, as well

12:10:07  1  as the fact that her brother's father, the

12:10:12  2  psychological father, is currently incarcerated and

12:10:15  3  will be for some time.  Obviously, the therapist can

12:10:18  4  address other issues as the therapist may deem

12:10:22  5  appropriate.

12:10:25  6          Both counsel will have access to any and

12:10:29  7  all contact with or records by said therapist.  This is

12:10:36  8  a temporary order only until we finish this trial on

12:10:40  9  June 2, 2022.

12:10:44 10          By the Court.  Copies to Attorneys

12:10:49 11  Harshberger and Bodene.

12:10:51 12          ATTORNEY BODENE:  May I clarify a couple

12:10:53 13  minor points?

12:10:53 14          THE COURT:  I said that awfully fast.

12:10:55 15  You won't get a copy of this until next week.  So yeah,

12:10:58 16  go ahead.

12:10:59 17          ATTORNEY BODENE:  Thank you.  I guess,

12:11:02 18  well, more a request for modification.  So with the

12:11:06 19  mail, may mother redact personal information like

12:11:10 20  social security numbers anything like going to be --

12:11:12 21          THE COURT:  Yes.  Add in there that when

12:11:20 22  mother sends records to father, confidential

12:11:25 23  information such as social security numbers may be

12:11:28 24  redacted.

12:11:29 25          ATTORNEY HARSHBERGER:  Point of

12:11:31  1    clarification.  She can mail it to me and then I can

12:11:33  2    mail it to him through attorney records.  So then it

12:11:36  3    won't -- I would still make sure that identification

12:11:39  4    information would be redacted.  She can check, I can

12:11:42  5    check and mail it to him.

12:11:43  6              THE COURT:  Not a bad idea.  I'll leave

12:11:44  7    you to work that out.  It's only a temporary order

12:11:47  8    anyway.

12:11:47  9              ATTORNEY BODENE:  On the point of

12:11:49 10    transportation, my client does not drive.  It is not

12:11:52 11    that her license is suspended.  She just doesn't have

12:11:54 12    her license.  For the temporary order, at least can we

12:11:58 13    request that grandfather would do the transportation

12:12:01 14    since this is a temporary and she hasn't testified yet

12:12:06 15    and she doesn't have a license.

12:12:09 16              THE COURT:  Sherri, go back and change

12:12:13 17    grandfather will have both children -- partial

12:12:16 18    custodial rights of both children one time for both

12:12:19 19    children for ten hours.  Saturday from 9 a.m. until 7

12:12:24 20    p.m.  First Saturday is this Saturday, April 9, and the

12:12:29 21    second Saturday of each month.  Grandfather, also known

12:12:33 22    as Pop Pop, will both pick up and deliver the children

12:12:36 23    to mother's residence.

12:12:39 24              Obviously, I gave him the extra hour so

12:12:41 25    he's not spending three of his which is why I

12:12:46  1    increased it from eight to nine, three of his eight

12:12:48  2    hours on the road.

12:12:49  3                    ATTORNEY BODENE:  I appreciate that,

12:12:50  4    Your Honor.  I understand.  If I may just one more

12:12:53  5    point.  Her residence has always been confidential and

12:12:57  6    really not an issue for -- father obviously has no

12:13:02  7    reason to know where she lives.  Can they meet at like

12:13:06  8    Rutter's or Sheetz or somewhere like that near her

12:13:09  9    residence?

12:13:09 10                    THE COURT:  No.  No.  I understand but

12:13:20 11    my hope is that at the very least grandfather and

12:13:24 12    mother will start to develop or maybe go back to would

12:13:30 13    be a better word -- go back to a better relationship

12:13:32 14    with each other.  I think mother has to have some

12:13:35 15    pretty full disclosure; telephone number, e-mail

12:13:40 16    address, and physical address.  And she just needs to

12:13:43 17    start to trust Pop Pop a little bit more.

12:13:48 18                    Having said that, you abuse that trust,

12:13:53 19    pass along information that she requests you not pass

12:13:56 20    along, that will be a horse of a whole different color.

12:14:02 21    Fair enough.  Okay.  Anything else?

12:14:05 22                    ATTORNEY BODENE:  It is just a genuine

12:14:08 23    sincere safety issue on her part.  I understand that

12:14:10 24    counsel will --

12:14:13 25                    THE COURT:  How can it be if the father

80

```
12:14:13  1    is in prison until at least 2026 or something?
12:14:18  2              ATTORNEY BODENE:  I understand, Your
12:14:22  3    Honor.  It is not information that father really needs
12:14:24  4    to know and if they --
12:14:29  5              THE COURT:  Candidly, Attorney Bodene,
12:14:30  6    these days with Google and all that if you want to find
12:14:33  7    someone's address, you can find it anyway.  I got to be
12:14:36  8    very honest with you.  Keeping that a secret is --
12:14:39  9    those days are gone.
12:14:42 10              ATTORNEY BODENE:  I understand.
12:14:42 11              THE COURT:  Sorry.  Attorney
12:14:47 12    Harshberger, anything else?
12:14:47 13              ATTORNEY HARSHBERGER:  Just I'm not sure
12:14:49 14    we can order this.  But unblock him on Facebook so he
12:14:53 15    can have those video calls on Facebook or I guess
12:14:56 16    however we can figure it out.
12:14:59 17              THE COURT:  I'm not going to order that,
12:15:00 18    but I would hope she would do that.  Again, she has got
12:15:06 19    to start developing some trust with grandfather.  And,
12:15:09 20    again, grandfather has got to honor that.  If she tells
12:15:12 21    you I don't want you to tell your son X, Y, or Z, you
12:15:16 22    should honor that.
12:15:18 23              THE GRANDFATHER:  I will.
12:15:20 24              THE COURT:  I heard you on the witness
12:15:20 25    stand.  You said you understood where she would have
```

12:15:22  1    some mistrust of your son.  You said you understood

12:15:26  2    that.  And I appreciated that.  I thought you were very

12:15:30  3    honest in that.  So I expect you to honor that.  Okay.

12:15:34  4                    THE GRANDFATHER:  I will honor it.

12:15:36  5                    THE COURT:  Fair enough.

12:15:37  6                    ATTORNEY BODENE:  Your Honor, just to

12:15:38  7    repeat one thing Your Honor had indicated previous.  If

12:15:40  8    we can indicate that during paternal grandfather's

12:15:45  9    time, he is not to allow any contact between the

12:15:46 10    children and father.  I think you indicated earlier

12:15:49 11    just to clarify.

12:15:50 12                    THE COURT:  Put in there if I didn't

12:15:52 13    already somewhere that father is to have no contact

12:15:54 14    with [A.P.] in any way at any time.

12:15:59 15                    ATTORNEY HARSHBERGER:  [R.H.] is okay?

12:16:01 16                    THE COURT:  Yes.  I did all of that

12:16:03 17    before that.  Put that in right after [R.H.]'s stuff.

12:16:07 18                    ATTORNEY BODENE:  Your Honor, it is --

12:16:09 19    paternal grandfather is allowed to have contact with

12:16:12 20    the kids.  Father is allowed to have contact with

12:16:14 21    [R.H.].  But why should paternal grandfather allow the

12:16:17 22    kids to have contact with father, that's the whole

12:16:22 23    other --

12:16:22 24                    THE COURT:  I'm lost.

12:16:24 25                    ATTORNEY HARSHBERGER:  His concern is

12:16:25 1    like the concern in chambers or in the jury room was

12:16:29 2    that if father calls grandfather while he has custody

12:16:34 3    this Saturday and [A.P.] is there.

12:16:39 4            THE COURT:  I thought that was clear,

12:16:41 5    but I'll make it even more clear.

12:16:44 6            ATTORNEY BODENE:  Do not let [A.P.] at

12:16:46 7    the phone.

12:16:46 8            THE COURT:  Where you put that father is

12:16:47 9    to have no contact with [A.P.] at any time, any way and

12:16:50 10   that includes specifically grandfather will not allow

12:16:55 11   any contact between the two of them while grandfather

12:16:59 12   is exercising any custodial rights of [A.P.].

12:17:04 13           THE GRANDFATHER:  I get it.

12:17:06 14           ATTORNEY BODENE:  Thank you, Your Honor.

12:17:07 15           THE COURT:  Anything else?

12:17:08 16           ATTORNEY BODENE:  No, Your Honor.

12:17:09 17           THE COURT:  Okay.  Mom, grandfather, I

12:17:15 18   really meant that.  I really want the two of you to go

12:17:18 19   back -- try to go back to a much better relationship

12:17:21 20   you had at one time.  I understand that is not easy.

12:17:24 21           Raising children is not easy.  And

12:17:31 22   candidly these kids are going to benefit from a

12:17:34 23   relationship with their grandfather.  I understand you

12:17:37 24   got trust issues.  That's why I have told grandfather

12:17:41 25   and I believe him.  He does understand it, why you

| 12:17:45 | 1 | would have trust issues. And I think he will honor |
| 12:17:47 | 2 | that. Try to develop that relationship. |
| 12:17:54 | 3 | Candidly, I would like to see a year or |
| 12:18:02 | 4 | two from now that the kids will be seeing grandfather |
| 12:18:06 | 5 | more often than I ordered because you volunteered that. |
| 12:18:09 | 6 | That is what I would really like to see. I said a year |
| 12:18:12 | 7 | or two from now because I understand there has to be |
| 12:18:13 | 8 | some time to build up some trust. I get that. These |
| 12:18:18 | 9 | children are not going to be seeing father for at least |
| 12:18:22 | 10 | what, at least four years, maybe longer. But that does |
| 12:18:24 | 11 | not mean they should not have a relationship with their |
| 12:18:27 | 12 | grandfather. Grandparents are very important in |
| 12:18:30 | 13 | children's lives. And I just really want to try to |
| 12:18:35 | 14 | emphasize that with all of the emphasis that I can |
| 12:18:38 | 15 | possibly put on it. Okay. I'll see everyone back on |
| 12:18:42 | 16 | June 2nd. |
| 12:18:43 | 17 | ATTORNEY HARSHBERGER: Thank you, Your |
| 12:18:43 | 18 | Honor. |
| 12:18:43 | 19 | ATTORNEY BODENE: Thank you. |
| 12:18:49 | 20 | (Proceedings are adjourned.) |
| | 21 | * * * |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

C E R T I F I C A T I O N

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the trial of the above cause, and that this copy is a correct transcript of the same.

*Sherri A. Reitano*

Sherri A. Reitano, RPR
Official Court Reporter